**Richard W. DUNNIGAN,**
**Petitioner–Appellee,**

v.

**John P. KEANE, Superintendent, Sing**
**Sing Correctional Facility,**
**Respondent–Appellant.**

**Docket No. 97–2570.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 21, 1997.

Decided Feb. 19, 1998.

ic—is a risk artists and their subjects must ac- cept.

Julie M. Lewis, Rochester, NY (Gregory J. McDonald, Harris Beach & Wilcox, Rochester, NY, on the brief), for Petitioner–Appellee.

Alicia R. Ouellette, Assistant Attorney General, Albany, NY (Dennis C. Vacco, Attorney General, Peter H. Schiff, Deputy Solicitor General, Nancy A. Spiegel, Assistant Attorney General, Albany, NY, on the brief), for Respondent–Appellant.

Before: OAKES, KEARSE, and FRIEDMAN, Circuit Judges *.

KEARSE, Circuit Judge:

Respondent John P. Keane, superintendent of the New York State (collectively the "State") correctional facility at which petitioner Richard W. Dunnigan is imprisoned, appeals from a judgment of the United States District Court for the Western District of New York, David G. Larimer, *Chief Judge*, conditionally granting Dunnigan's petition for a writ of habeas corpus unless the State grants Dunnigan a new trial. The district court concluded that Dunnigan, convicted in state court of robbery and related offenses, was denied due process by the admission at his trial of (a) testimony that revealed part of his criminal history, and (b) an eyewitness's pretrial identification of him. On appeal, the State contends principally that any error in the trial court's rulings either was not an error of constitutional dimension or was harmless. We agree, and we reverse the judgment of the district court.

## I. BACKGROUND

On Labor Day weekend in 1989, Robert Nuchereno and his girlfriend Jennifer Zielinski, accompanied by three other couples, were guests at a motel in Canandaigua, New York. An intruder entered the room shared by Nuchereno and Zielinski, knocked Zielinski unconscious, stole her wallet, and, after

arguing and struggling with Nuchereno, escaped. Dunnigan was eventually identified as the intruder. Following a jury trial in state court, he was convicted of first-degree burglary, second-degree robbery, fourth-degree grand larceny, and second-degree assault, and was sentenced to 12–24 years' imprisonment.

The following description of the events is taken principally from the testimony at trial. The issues on this appeal center not on the sufficiency of the evidence identifying Dunnigan as the robber but on the admission of certain of the identification evidence, and related evidence, at his trial.

### A. The Events

Early Sunday evening September 3, 1989, Nuchereno emerged from the bathroom of his and Zielinski's motel room to investigate a "loud thump." (Trial Transcript ("Tr.") 107.) He found Zielinski unconscious on the floor; squatting over her was a man whom he did not recognize and who, unbeknownst to Nuchereno at the time, had taken Zielinski's wallet from her purse. The robber, who was approximately five feet from Nuchereno, looked up, visibly startled, when Nuchereno entered the room. After a brief exchange of words, the robber ran from the motel room into the parking lot and to his car, with Nuchereno in pursuit.

Nuchereno prevented the car door from closing, and again he came face to face with the robber. A brief struggle ensued inside the car, during which the robber struck Nuchereno several times in the head. Nuchereno then saw the robber reach for the glove compartment; fearing a gun or a knife, he backed off, and the robber fled. Nuchereno, with a member of his party who had been alerted to the altercation, attempted to follow the robber in Nuchereno's car but could not locate him.

Later that evening, Nuchereno described the robber to the police as a well-built white male in his mid–20s, approximately 5'11" tall and weighing about 180 pounds, with reced-

---

* Honorable Daniel M. Friedman, of the United States Court of Appeals for the Federal Circuit, sitting by designation.

ing "blondish" hair and "bugged eyes." (Tr. 129–30, 338.) He described the robber's car as a two-door, cream-colored, older-model Chrysler-brand car, with a vinyl top and areas of rust along the bottom. Zielinski, who had been struck from behind and remained unconscious until after the robber fled, was unable to give any description. Susan Smith, another member of the Nuchereno–Zielinski party, had looked into the parking lot after hearing shouts during the struggle and had seen the robber as he was grappling with Nuchereno in the car and then escaping. Smith gave the police descriptions of driver and car that were less extensive than, but generally consistent with, Nuchereno's descriptions.

B. *The Investigation*

Zielinski's wallet contained, *inter alia*, an automatic teller machine ("ATM") card from Key Bank, along with her note of the personal identification number required for use of the card. Soon after the robbery, in a series of western New York cities, numerous attempts, most of them unsuccessful, were made to withdraw money using Zielinski's card. Certain of the ATMs at which Zielinski's card was used were equipped with security cameras that recorded these attempts on videotape.

On Tuesday September 5, 1989, the first business day after the theft, Key Bank security investigator Joel Scime was notified of the theft. He made pictures from the ATM videotapes, and on September 6, he asked Nuchereno to view more than 30 such pictures. Each picture appeared to be of the same man, who was wearing a sweatshirt bearing the words "Number One Dad," using an ATM card. No other pictures were shown. Nuchereno immediately and unequivocally identified the man in the pictures as the robber.

Scime then circulated copies of the pictures to private investigators and law enforcement agencies in the western New York area. On October 24, he received a call from Eugene Baes, a New York State parole officer who had just seen the flyer circulated by Scime and recognized the man. Baes met with Scime the next day, reviewed additional

pictures, and identified the man as Dunnigan, one of Baes's parolees.

In addition to her ATM card, Zielinski had had in her wallet business cards showing her unlisted home telephone number. Three days after the robbery, a message was left on her answering machine at that number by a man who did not identify himself and whose voice Zielinski did not recognize; the man threatened to visit Zielinski. Scime played the answering machine tape for Baes, who, in performing his parole supervision duties, had spoken to Dunnigan many times in person and several times by telephone. Baes identified the voice on the answering machine tape as that of Dunnigan.

Based on information provided by Scime and Baes, Dunnigan was arrested. After obtaining a warrant, the police searched the hotel room where Dunnigan was then living. In the closet, they found a sweatshirt bearing the words "Number One Dad."

C. *The Trial and the Admissibility Rulings*

In an omnibus pretrial motion, Dunnigan requested a *Wade*-type hearing, *see United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), as to the reliability of Nuchereno's identification of the man in the ATM surveillance pictures, contending that Scime's showing of the pictures was suggestive and misleading. The state court denied this request, ruling that because the identification had been arranged by a private investigator, rather than by the police, no such hearing was required under New York law. Though state law gave the court discretion to conduct such a hearing, the court ruled that, in the circumstances of this case, no hearing was needed.

In addition, immediately prior to trial, Dunnigan asked the court to exclude Baes's anticipated testimony that he was Dunnigan's parole officer, arguing that the jury would be unfairly prejudiced by the information that Dunnigan was on parole. The court acknowledged that the testimony could have some prejudicial effect and stated that it "would give an appropriate limiting instruction" (Tr. 19), but it declined to exclude the

evidence in light of its relevance to Baes's identification of Dunnigan.

Accordingly, at Dunnigan's trial in September 1990, both Nuchereno and Baes were allowed to describe their respective identifications. The testimony of Baes began as follows:

Q. Mr. Baes, could you tell us your occupation, please?

A. Parole officer.

. . . .

Q. . . . . And can you tell us what your duties consist of?

A. Yes. We supervise, ah, convicted felons that are released from state prisons.

. . . .

Q. And did there come a time when you supervised Mr. Dunnigan as a parolee?

A. Yes, I did.

Q. When did you begin to supervise him, Mr. Baes?

A. I believe he was released January 23rd from the Attica Correctional Facility.

(Tr. 277–78.) Baes proceeded to testify, substantially as set out in Part I.B. above, that from his regular meetings and telephone conversations with Dunnigan, he was familiar with Dunnigan's appearance and voice. He described recognizing Dunnigan in Scime's flyer, meeting with Scime, and identifying Dunnigan. The answering machine tape was played, and Baes identified the voice as that of Dunnigan. The trial court did not give an instruction as to the limited purpose for which Baes's job as a parole officer could be considered and did not caution the jury to disregard Dunnigan's criminal history and parolee status. Dunnigan did not object to any of Baes's testimony and did not ask or remind the court to give the promised limiting instruction.

Both Nuchereno and Scime described Scime's showing Nuchereno the ATM pictures and Nuchereno's immediate identification of the man in those pictures as the robber. Nuchereno made an in-court identification of Dunnigan as the robber. Smith too made an in-court identification of Dunnigan as the man she had seen struggling with Nuchereno.

In addition, several witnesses testified that in November 1989, they had attended a parole hearing concerning Dunnigan, and that as they entered a nearby parking lot, in which there were numerous cars, Nuchereno excitedly spied a car in the lot that he identified as the car in which the robber had escaped on September 3. Police investigation revealed that the car was registered to Dunnigan; his wife had driven it to the parole hearing. Photographs of the car were identified by Nuchereno and Smith at trial.

The defense called several witnesses, including Dunnigan's wife, his mother who lived in Long Island, New York, and two other Long Island residents who were parents of a friend of Dunnigan's wife. All of these witnesses testified that Dunnigan was in Long Island—which is more than a 300–mile drive from Canandaigua—on Labor Day weekend in 1989, including the evening of September 3. His wife testified that she and Dunnigan drove to Long Island on September 1 in her car, leaving Dunnigan's cream-colored Chrysler parked in front of her apartment building; they did not return until about 9:30 Monday evening September 4. Dunnigan's wife and mother also testified that the voice on Zielinski's answering machine was not Dunnigan's; his wife testified that Dunnigan was not the man in the ATM pictures.

In rebuttal, the prosecution presented evidence from Dunnigan's former employer that Dunnigan's wife had asked the employer to provide her with a letter stating, falsely, that Dunnigan had been present at work on September 1, 5, and 6. In summation, the prosecutor urged the jury to reject the testimony of Dunnigan's wife and mother that Dunnigan was not the man captured on videotape or the answering machine because they were biased, and instead to accept the identification testimony of Baes, in part because he was Dunnigan's parole officer:

Mr. Baes listened to that tape and said without any doubt that is the voice of Richard Dunnigan. Now, [defense counsel] says this defendant's mother, this defendant's wife say it is not his voice. Realistically, ask yourselves this question, what are they going to say? If they say yes, it

is his voice, that is just like saying yes, my son, yes, my husband is guilty of this crime. No matter what is on that tape, even if that tape said, "Hi. This is Richard Dunnigan. I am going to come get you," you know that they would say that is not my son's voice. Gene Baes is the only objective person who testified before you as to listening to that tape. He said no doubt whatsoever, I recognized that voice, it is the defendant's. Gene Baes is objective in this case. From his testimony there is nothing to indicate any axe to grind against this defendant. *You can imagine what a personal setback it is for a parole officer to have one of his parolees commit a crime, go bad. Do you think that Gene Baes, he is going to implicate his parolee in these crimes if he was not one hundred percent certain that this defendant committed those crimes?*

(Tr. 565–66 (emphasis added).) Dunnigan did not object to the summation.

After approximately five hours of deliberation, during which the jury asked to see ATM videotapes but did not request any rereading of testimony, the jury returned a verdict of guilty on all counts.

Dunnigan appealed to the Appellate Division, which affirmed, expressly addressing only his contentions that the trial court either should have suppressed Nuchereno's identification testimony because Scime's procedure was impermissibly suggestive, or should at least have held a *Wade* hearing to assess the reliability of that identification. The Appellate Division ruled that neither suppression nor a hearing was required because Scime was not a law enforcement officer and acted independently in preparing and showing the photographs, and because Nuchereno's identification testimony was strong. *People v. Dunnigan*, 188 A.D.2d 1052, 1053, 592 N.Y.S.2d 207, 207 (4th Dep't 1992). The court rejected, without discussion, Dunnigan's contention that he was entitled to a new trial because of the admission of Baes's testimony revealing that Dunnigan had a prior criminal record. Since that court had recently held in another case that the admission of such testimony was error, *see People v. Hammock*, 182 A.D.2d 1114, 1115, 583

N.Y.S.2d 89, 90 (4th Dep't 1992); *see also People v. Price*, 135 A.D.2d 750, 751, 522 N.Y.S.2d 870, 871–72 (2d Dep't 1987), and since in rejecting Dunnigan's *Wade* contention the court referred to "the strength of Nuchereno's identification testimony," 188 A.D.2d at 1053, 592 N.Y.S.2d at 207, it is inferable that the *Dunnigan* court concluded that the admission of Baes's testimony without a limiting instruction was harmless, *see, e.g., People v. Price*, 135 A.D.2d at 751, 522 N.Y.S.2d at 871–72. Dunnigan's motion for leave to appeal to the New York Court of Appeals was denied, as were his subsequent state-court motions for collateral relief.

### D. The Present Proceeding

Initially proceeding *pro se*, Dunnigan filed his present habeas petition pursuant to 28 U.S.C. § 2254 (1994) alleging, *inter alia*, that he had been denied the effective assistance of trial and appellate counsel, and that he had been denied due process (a) by the admission of the testimony regarding his parolee status without a limiting instruction to the jury, and (b) by the admission of Nuchereno's identification testimony without a *Wade* hearing. After Dunnigan withdrew unexhausted claims, the district court appointed counsel to represent him. In an opinion reported at 972 F.Supp. 709 (1997), the court, though concluding that Dunnigan's claims of ineffective assistance of counsel were without merit, granted the petition on the grounds that "the trial court's error in allowing Baes to testify as to Dunnigan's parole status was sufficiently egregious by itself so as to grant Dunnigan's petition for a writ of habeas corpus," and that in any event, that error in combination with the failure to hold a *Wade* hearing on Nuchereno's identification clearly warranted a new trial. 972 F.Supp. at 717.

As to Baes's testimony, the court found that, although his identification of Dunnigan as the man in the ATM pictures and the voice on the answering machine tape "was certainly relevant," *id.* at 714, the foundation for Baes's ability to recognize Dunnigan could have been achieved through testimony simply as to the frequency and conditions of their contacts, without disclosing that Baes was Dunnigan's parole officer. The court

viewed the fact that Baes was Dunnigan's parole officer as irrelevant, and stated that the admission of that fact was prejudicial because

> the jury was apprised of the fact that Dunnigan had previously been convicted of a felony, that he had been incarcerated at the Attica Correctional Facility, and that he was on parole at the time of the instant offense. None of those matters was relevant as to whether Dunnigan committed the instant offense. Because there was no cautionary instruction of any kind, the jury was left to speculate as to the nature of the prior offense and there was nothing to prevent the jury from utilizing Dunnigan's prior record for an improper purpose, that is, to establish his propensity to commit crime.

*Id.* at 713. The court found that the error was exacerbated by the prosecutor's emphasis on Baes's occupation in summation. The court continued:

> Allowing the evidence concerning Dunnigan's prior record is troubling enough, but allowing the evidence without any cautionary instruction renders the evidence fatally prejudicial and denied Dunnigan a fair trial.
>
> Like the rule that the prosecution may not use for impeachment purposes a defendant's post-*Miranda* silence, the rule that evidence of past crimes may not be used to show propensity to commit the crime for which a defendant is being tried "is rooted in fundamental fairness and due process concerns." *Brecht* [*v. Abrahamson*, 507 U.S. 619, 629, 113 S.Ct. 1710, 1717, 123 L.Ed.2d 353 (1993)]. In the present case, the testimony that Dunnigan was a convicted felon who was released from Attica was highly and unfairly prejudicial. Furthermore, I find that this constitutional error did have a "substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos* [*v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)].

972 F.Supp. at 714 (footnotes omitted).

As to Nuchereno's identification of the person in the ATM pictures as the robber, the court found that

> the pre-identification procedure was clearly unduly suggestive.... Scime telephoned Nuchereno and told him that he had some pictures he wanted Nuchereno to see. At trial, Nuchereno indicated that he knew to what the pictures referred because there was only one reason why Scime would contact him. Nuchereno knew Scime was the bank detective who was investigating the ATM fraud. When Nuchereno arrived at Scime's office, he was shown thirty-three pictures of the same individual at the ATM machine. He was not shown pictures of anyone else. At the time of this viewing, it is clear that Nuchereno knew that someone had used his girlfriend's bank card to deplete her account. The photographs, of course, depicted this individual engaged in precisely that type of activity.... [I]dentification of the robber was the single most important and disputed issue in this case, and it is clear to me that the procedure used here concerning the single photo display was unduly and highly suggestive.

*Id.* at 715–16. The court also found that, because of the brief and shocking nature of the encounter, and because of discrepancies between Nuchereno's September 3 description of the robber to the police and Dunnigan's description of himself (*see* Part II.B. below), Nuchereno's pretrial identification of the man in the ATM pictures as the robber did not have sufficient indicia of reliability to permit a finding that that identification had a source independent of Scime's suggestive showing of the pictures. Accordingly, the court concluded that the introduction of Nuchereno's identification at trial violated Dunnigan's right to due process.

Although the district court "decline[d]" to find that that violation, standing alone, warranted the granting of the writ, it concluded that when Nuchereno's identification testimony was

> considered in conjunction with the testimony concerning Dunnigan's parole status, the cumulative effect of the two errors provide[d] more than a sufficient basis to find that Dunnigan's trial was fundamentally unfair.

*Id.* at 717. The court ordered the State either to retry Dunnigan within 90 days or to release him from custody. On the State's motion, the district court stayed its order pending resolution of this appeal, which we expedited.

## II. DISCUSSION

On appeal, the State argues that none of the trial court's rulings, if erroneous, were errors of constitutional dimension, and, alternatively, that any such errors were harmless. For the reasons that follow, we agree.

### A. *Dunnigan's Criminal History*

The State acknowledges that the admission, without a limiting instruction, of testimony revealing that Dunnigan was a convicted felon may have been an error of state law, but argues that in this case it was not an error of federal constitutional dimension justifying a writ of habeas corpus. We agree.

A federal court conducting habeas review is limited to determining whether a petitioner's custody is in violation of federal law. *See* 28 U.S.C. § 2254(a); *see, e.g., Estelle v. McGuire,* 502 U.S. 62, 68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991); *Engle v. Isaac,* 456 U.S. 107, 119, 102 S.Ct. 1558, 1567, 71 L.Ed.2d 783 (1982). "[F]ederal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire,* 502 U.S. at 67, 112 S.Ct. at 480 (internal quotation marks omitted); *see Lewis v. Jeffers,* 497 U.S. 764, 780, 110 S.Ct. 3092, 3102, 111 L.Ed.2d 606 (1990); *Pulley v. Harris,* 465 U.S. 37, 41, 104 S.Ct. 871, 874–75, 79 L.Ed.2d 29 (1984); *Bibbins v. Dalsheim,* 21 F.3d 13, 18 (2d Cir.) (per curiam), *cert. denied,* 513 U.S. 901, 115 S.Ct. 261, 130 L.Ed.2d 181 (1994).

Due process requires the state courts in conducting criminal trials to proceed consistently with "that fundamental fairness" which is "essential to the very concept of justice." *Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166 (1941); *see Spencer v. Texas,* 385 U.S. 554, 563–64, 87 S.Ct. 648, 653–54, 17 L.Ed.2d 606 (1967). The introduction of unfairly prejudicial evidence against a defendant in a criminal trial is contrary to both state law, *see,*

*e.g., People v. Jackson,* 227 A.D.2d 137, 140, 641 N.Y.S.2d 840, 843 (1st Dep't 1996); *People v. Herman,* 187 A.D.2d 1027, 1028, 590 N.Y.S.2d 619, 620 (4th Dep't 1992); *see generally* 1A *Wigmore on Evidence* § 58.2 (Tillers rev.1983), and federal law, *see, e.g.,* Fed. R.Evid. 403. But not all erroneous admissions of such evidence are errors of constitutional dimension. The introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence "is so extremely unfair that its admission violates fundamental conceptions of justice." *Dowling v. United States,* 493 U.S. 342, 352, 110 S.Ct. 668, 674, 107 L.Ed.2d 708 (1990) (internal quotation marks omitted).

Where the prejudicial evidence is "probative of [an] essential element" in the case, its admission does not violate the defendant's right to due process. *Estelle v. McGuire,* 502 U.S. at 69, 112 S.Ct. at 481 (reversing grant of habeas, "[c]oncluding . . . that [since] the . . . evidence was relevant to an issue in the case," the Court "need not explore further the apparent assumption of the Court of Appeals that it is a violation of . . . due process . . . for evidence that is not relevant to be received in a criminal trial"). For the erroneous admission of other unfairly prejudicial evidence to amount to a denial of due process, the item must have been "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Johnson v. Ross,* 955 F.2d 178, 181 (2d Cir.1992) (internal quotation marks omitted); *Collins v. Scully,* 755 F.2d 16, 19 (2d Cir.1985) (evidence must be "crucial, critical, highly significant" (internal quotation marks omitted)). In assessing materiality, we must review the erroneously admitted evidence "in light of the entire record before the jury." *Id.; see also McKinney v. Rees,* 993 F.2d 1378, 1384, 1386 & n. 10 (9th Cir.), *cert. denied,* 510 U.S. 1020, 114 S.Ct. 622, 126 L.Ed.2d 586 (1993) (due process violation found where evidence of the defendant's other acts occupied "over sixty pages of testimony in the record" and was twice mentioned by the prosecutor in summation as "one of [the] crucial issues in the case").

■ In the present case, there were three facets of Baes's testimony that were objectionable: (1) that Baes was Dunnigan's parole officer, (2) that Baes supervised convicted felons, and (3) that Dunnigan had been incarcerated at the Attica Correctional Facility ("Attica"), an institution associated in some minds with violent criminals. The references to "felons" and "Attica" plainly were not necessary to provide a foundation for Baes's identifications of Dunnigan and were not relevant for any other purpose. And although disclosure of the general nature of Baes's duties was a logical consequence of the court's allowing him to disclose his job, the mention of Attica was not even responsive to the prosecutor's question ("[w]hen did you begin to supervise [Dunnigan]"). Nonetheless, these two facts received only brief mention, each appearing in only one sentence of Baes's testimony, which covered more than 30 pages of transcript. No other witness made reference to felons or to Attica, and those aspects of Baes's testimony were not mentioned in argument to the jury. Although a limiting instruction, and an instruction that the jury should disregard the reference to Attica altogether, were plainly warranted, Dunnigan neither objected to these facets of the testimony nor requested such instructions. In the circumstances, we cannot conclude that the brief mention of these two facts denied Dunnigan that fundamental fairness which is essential to the concept of justice.

■ Analysis of the admission of the first of the above facts, however, i.e., that Baes was Dunnigan's parole officer, is somewhat more complicated. We agree with the district court's view that much of the purpose of its admission could have been achieved without disclosing that Baes was Dunnigan's parole officer and thereby introducing the irrelevant fact that Dunnigan had a criminal record, but we disagree with the view that Baes's occupation was irrelevant. The purpose of introducing Baes's position was to show his familiarity with Dunnigan's appearance and voice, which was a necessary foundation for Baes's identification testimony. Thus, the bulk of his preliminary testimony described the physical aspects of his opportunities to gain that familiarity: the frequency of his meetings with Dunnigan, the lighting conditions, how close they sat to one another, the extent to which they conversed, and the fact that they spoke several times on the telephone. All of these features of Baes's contacts with Dunnigan could have been brought out without disclosing that Baes was Dunnigan's parole officer.

Yet, Baes's parole supervision responsibility was relevant in at least two ways. First, the degree of attention that Baes paid Dunnigan in their meetings would plainly have been important to a factfinder's assessment of the likelihood that Baes's identifications of Dunnigan as the man in the ATM pictures and on the answering machine were correct. The fact that it was Baes's professional responsibility to meet with Dunnigan and to assess whether Dunnigan was conducting himself properly would have indicated that Baes was likely to be attentive in their meetings and to be particularly observant of Dunnigan's appearance and demeanor. In addition, it may well be material for the factfinder, in evaluating a witness's credibility, to know the relationship between the witness and the parties in order to assess whether the witness may have reasons for lacking objectivity. Thus, just as it was important for the jury to know that the witnesses who said that Dunnigan was not the person in the ATM pictures and on the answering machine were his wife and mother, which suggested likely bias in his favor, it was important for the jury to know the relationship between Dunnigan and Baes, in order to assess whether Baes was likely to be biased against him. In all the circumstances, while it would have been possible for the most important foundation facts to be brought out without disclosing Dunnigan's parolee status, we think it was certainly permissible for the trial judge to conclude that Baes's position vis-à-vis Dunnigan was relevant.

■ However, having decided to admit the fact that Baes was Dunnigan's parole officer, the trial judge plainly was required by state law to give a cautionary instruction that the jury was not to infer from Dunnigan's parolee status either that he had a

propensity for committing crimes or that he was guilty of the crimes charged in this case. *See, e.g., People v. Hammock,* 182 A.D.2d at 1115, 583 N.Y.S.2d at 90; *People v. Price,* 135 A.D.2d at 751, 522 N.Y.S.2d at 871–72; *see also Huddleston v. United States,* 485 U.S. 681, 691–92, 108 S.Ct. 1496, 1502, 99 L.Ed.2d 771 (1988) (in federal case, trial judge, if requested, is required by Fed. R.Evid. 105 to give such a limiting instruction); *United States v. Tarricone,* 996 F.2d 1414, 1421 (2d Cir.1993) (same). In some circumstances, we could envision that a refusal to give such an instruction would constitute an error so egregious as to amount to a denial of due process; but we cannot conclude that there was such a refusal in the circumstances of the present case. When the issue of Baes's anticipated testimony was raised, immediately prior to trial, Dunnigan objected to its admission, and the court stated that it would allow Baes to reveal his occupation but that it would give the jury "an appropriate limiting instruction" (Tr. 19). Yet, when the court did not interject a limiting instruction at trial, Dunnigan sat mute; he did not request such an instruction, either when Baes testified or when the court was giving its final charge to the jury. We have no doubt whatever, in light of the pretrial discussion, that had Dunnigan reminded the court, the court would have given the required instruction. Since it is indisputable that Dunnigan's attorney, having argued the point just prior to trial, was aware of the import of Baes's position, and since it defies credulity to suppose that, having received assurance of the court's willingness to give a limiting instruction as to that matter on the first day of trial, he had forgotten that willingness by the time Baes testified two days later, we can only conclude that the defense's silence was a conscious election not to request the instruction. Dunnigan cannot be considered the victim of any fundamental unfairness because of the trial court's failure to give an instruction that Dunnigan was well aware would be given if he simply reminded the court to give it.

 Nor can we conclude that the additional matter of the prosecutor's summation reference to Baes's position—suggesting that it was a "personal setback" for Baes to have "one of his parolees" charged with a crime—rendered these proceedings fundamentally unfair. While we agree that that argument was of questionable propriety, we note that once again, Dunnigan did not object, and we cannot conclude that the unobjected-to argument, taken in context, provides ground for habeas relief. The mention of Baes's position was but a small part of the prosecutor's summation, the heart of which was his emphasis on, *inter alia,* the events during the robbery, Scime's investigation, Nuchereno's identifications, Baes's identifications, and the discovery of distinctive clothing in Dunnigan's closet matching that worn by the man using Zielinski's card. No argument was made with respect to Dunnigan's criminal history; the prosecutor mentioned Baes's position as a parole officer only as a reason for the jury to consider him objective and thus a more credible witness than Dunnigan's wife and mother.

In sum, we conclude that the fact that Baes was Dunnigan's parole officer was not irrelevant to the issue of the credibility of Baes's identification testimony. Moreover, in light of the compelling evidence that Dunnigan was the robber, we cannot say that the disclosure of the fact that he had previously been convicted of a crime was a material basis for his conviction here. Thus, although the trial court should have given the jury a cautionary instruction, as it had advised the parties it would, we conclude that, in light of Dunnigan's election not to remind the court to give such an instruction, the failure to give that instruction was not so egregious as to deny Dunnigan due process.

### B. *Nuchereno's Pretrial Identification*

 The State challenges the district court's conclusion that Nuchereno's pretrial identification of the robber from the ATM pictures was improperly admitted, arguing that no *Wade* hearing was required because the police were not involved in showing those pictures to Nuchereno, that Nuchereno's identification was reliable regardless of any suggestiveness in that initial showing, and that any error in the admission of his identification testimony was harmless. We conclude that Nuchereno's testimony was not

improperly admitted because, despite the suggestive procedure used by Scime, Nuchereno's identification had an independent basis sufficient to indicate that it was not unreliable.

▮ Preliminarily, we note our rejection of the State's contention that no due process scrutiny of Nuchereno's pretrial identification was required on the theory that Scime, who showed the pictures, was a private investigator acting independently, and not as an agent of the police. *Accord United States v. Bouthot*, 878 F.2d 1506, 1516 (1st Cir.1989); *Thigpen v. Cory*, 804 F.2d 893, 895 (6th Cir.1986), *cert. denied*, 482 U.S. 918, 107 S.Ct. 3196, 96 L.Ed.2d 683 (1987); *Green v. Loggins*, 614 F.2d 219, 223 (9th Cir.1980). The due process focus, in the identification context, is principally on the fairness of the trial, rather than on the conduct of the police, for a suggestive procedure "does not in itself intrude upon a constitutionally protected interest." *Manson v. Brathwaite*, 432 U.S. 98, 113 n. 13, 97 S.Ct. 2243, 2252 n. 13, 53 L.Ed.2d 140 (1977). Such procedures are disapproved "because they increase the likelihood of misidentification," and it is the admission of testimony carrying such a "likelihood of misidentification which violates a defendant's right to due process." *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). "[I]t follows that federal courts should scrutinize all suggestive identification procedures, not just those orchestrated by the police, to determine if they would sufficiently taint the trial so as to deprive the defendant of due process." *United States v. Bouthot*, 878 F.2d at 1516. The linchpin of admissibility, therefore, is not whether the identification testimony was procured by law enforcement officers, as contrasted with civilians, but whether the identification is reliable. *See generally Watkins v. Sowders*, 449 U.S. 341, 347, 101 S.Ct. 654, 658, 66 L.Ed.2d 549 (1981) ("[i]t is the reliability of identification evidence that primarily determines its admissibility"); *Manson v. Brathwaite*, 432 U.S. at 114, 97 S.Ct. at 2253 ("reliability is the linchpin in determining the admissibility of identification testimony"); *United States v. Wong*, 40 F.3d 1347, 1359 (2d Cir.1994),

*cert. denied*, 514 U.S. 1113, 115 S.Ct. 1968, 131 L.Ed.2d 858 (1995).

▮ If the pretrial procedures were impermissibly suggestive, due process requires that the identification testimony be excluded unless a threshold level of reliability can be established through evidence that is independent of the suggestive procedure. *See, e.g., Manson v. Brathwaite*, 432 U.S. at 114, 97 S.Ct. at 2253; *United States v. Ciak*, 102 F.3d 38, 42 (2d Cir.1996); *United States v. Kwong*, 69 F.3d 663, 666 (2d Cir.1995), *cert. denied*, 517 U.S. 1115, 116 S.Ct. 1343, 134 L.Ed.2d 491 (1996). The factors to be considered in determining whether identification testimony is independently reliable include

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Neil v. Biggers*, 409 U.S. at 199–200, 93 S.Ct. at 382; *accord Manson v. Brathwaite*, 432 U.S. at 114, 97 S.Ct. at 2253. These factors are to be analyzed in light of the totality of the circumstances, *see, e.g., Neil v. Biggers*, 409 U.S. at 199, 93 S.Ct. at 382; *United States v. Concepcion*, 983 F.2d 369, 377–78 (2d Cir.1992), *cert. denied*, 510 U.S. 856, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993), and weighed against the corrupting effect of the suggestive confrontation, *see, e.g., Manson v. Brathwaite*, 432 U.S. at 114, 97 S.Ct. at 2253; *United States v. Wong*, 40 F.3d at 1359. "Short of th[e] point" at which the court must conclude, after considering these factors, that "under all the circumstances of th[e] case, there is a very substantial likelihood of irreparable misidentification," the presence of some element of untrustworthiness goes only to the identification's weight, not to its admissibility. *Manson v. Brathwaite*, 432 U.S. at 116, 97 S.Ct. at 2254 (internal quotation marks omitted).

▮ Where there is a contention that the pretrial identification was the result of impermissibly suggestive procedures, a *Wade* hearing is advisable; but the Supreme Court

has made it clear that there is no *"per se* rule compelling such a [hearing] in every case." *Watkins v. Sowders,* 449 U.S. at 349, 101 S.Ct. at 659; *see also United States v. Archibald,* 734 F.2d 938, 940 ("No per se rule requires such a hearing . . . ."), *modified on other grounds,* 756 F.2d 223 (2d Cir.1984); *Brown v. Harris,* 666 F.2d 782, 785 (2d Cir. 1981), *cert. denied,* 456 U.S. 948, 102 S.Ct. 2017, 72 L.Ed.2d 472 (1982). Even if "the *only* duty of [the] jury" in the case is "to assess the reliability of th[e identification] evidence," *Watkins v. Sowders,* 449 U.S. at 347, 101 S.Ct. at 658 (emphasis in original), the information needed for assessment of reliability can ordinarily be elicited through "the time-honored process of cross-examination," *id.* at 349, 101 S.Ct. at 659.

> [W]hile identification testimony is significant evidence, such testimony is still only evidence, and, unlike the presence of counsel, is not a factor that goes to the very heart—the 'integrity'—of the adversary process.
>
> Counsel can both cross-examine the identification witnesses and argue in summation as to factors causing doubts as to the accuracy of the identification—including reference to both any suggestibility in the identification procedure and any countervailing testimony such as alibi.

*Id.* at 348, 101 S.Ct. at 658–59 (internal quotation marks omitted).

In the present case, there can be no dispute that the procedure followed by Scime was highly suggestive. When Nuchereno received the call from Scime to look at pictures, the obvious implication was that they were—or included—pictures of a person using Zielinski's ATM card. Scime then conducted, in effect, a photographic showup, presenting Nuchereno with more than 30 pictures of one individual using an ATM card, and no pictures of anyone else. Thus, the trial court could not properly admit identification testimony by Nuchereno in the absence of evidence sufficient to permit a finding that his identification had a basis independent of the photographic showup.

■ Although it might have been preferable for the state court to hold a pretrial *Wade* hearing, we see no indication that the basis for Nuchereno's pretrial identification was not adequately explored within the framework of the *Neil v. Biggers* factors at trial. For example, both Nuchereno and the police officer to whom he gave his initial description of the robber were cross-examined about that description. Nuchereno and Scime were cross-examined as to the certainty of Nuchereno's identification of the robber from the pictures. And Nuchereno was cross-examined at length as to his opportunity to see the robber and his attention to the details of the robber's appearance. Accordingly, we conclude that the proper factors were appropriately aired without a pretrial *Wade* hearing.

Further, applying the *Neil v. Biggers* analysis to Nuchereno's testimony, we conclude that most of those factors indicate that his pretrial and in-court identifications were independently reliable. First, Nuchereno had a clear opportunity to view the robber at the time of the crime. There was still daylight; the two were just five feet apart when Nuchereno emerged from the bathroom; and the robber looked up at Nuchereno, who was able to see his face and to see his startled expression. Moreover, the robber did not instantly turn and flee; instead, he remained face-to-face with Nuchereno long enough for Nuchereno to threaten to capture him and for the robber to respond. In addition, Nuchereno and the robber again came face-to-face at the robber's car. Second, Nuchereno was not a casual or inattentive observer; rather, he had entered the room from the bathroom for the specific purpose of investigating the loud noise he had heard. He was alert that there was something unusual to be observed; his attention plainly did not wane when he discovered that there was an intruder or when he chased the intruder into the parking lot and there engaged in hand-to-hand combat; and, considering that he continued to pursue the robber by car, he obviously did not find the encounter so shocking as to make him lose focus. Further, the interval between the crime and the pretrial identification was short, just three days, making it unlikely—especially in light of the nature of the confrontation—that Nuchereno had forgotten what the robber looked like.

And, when Nuchereno was shown the pictures, he recognized the robber immediately and unequivocally.

The only factor that does not clearly militate in favor of finding that Nuchereno's identification was independently reliable is that there were some discrepancies between his initial description of the robber and the record before us as to Dunnigan's actual appearance. Nuchereno told the police that the robber was a well-built white male who had "blondish" hair that was receding, and he estimated that the robber was in his mid–20s, approximately 180 pounds, and 5'11" tall. The only information before us as to Dunnigan's actual appearance comes from *pro se* papers filed by Dunnigan in the district court. According to those papers, Dunnigan is a white male, his hair is gray, and his hairline is receding—none of which suggests misidentification. But Dunnigan says that he is 6'1" tall (not 5'11"), and that at the time of the robbery he weighed 210 pounds (not 180) and was in his mid–30s (not his mid–20s). Even accepting as true Dunnigan's description of himself at the time of the robbery, the discrepancies as to height and weight do not seem substantial, given that, while in Nuchereno's presence, the robber was not standing still but was squatting, running, or sitting. Further, what few discrepancies there may be are outweighed by the other factors set forth above, including Nuchereno's attentiveness, his repeated, close-range, unobstructed opportunity to see the robber's face, his detailed and accurate description of the car, and his subsequent spontaneous recognition of the car in a crowded parking lot, all of which strongly support the reliability of his identification.

We conclude that the evidence supported the trial court's ruling that Nuchereno's identification of Dunnigan had a sufficient basis independent of Scime's procedure. Any discrepancies between Nuchereno's description and Dunnigan's actual appearance went to the weight of the identification, not to its admissibility. The admission of the evidence did not violate Dunnigan's right to due process.

## C. *Harmless Error*

Finally, we note that even if we concluded that the admission of Baes's occupation and Nuchereno's identification were errors and were of constitutional dimension, we would nonetheless conclude that habeas relief was inappropriate because those errors did not have a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 1714, 123 L.Ed.2d 353 (1993) (internal quotation marks omitted); *see, e.g., Headley v. Tilghman,* 53 F.3d 472, 474 (2d Cir.), *cert. denied,* 516 U.S. 877, 116 S.Ct. 207, 133 L.Ed.2d 140 (1995), in light of "the overall strength of the prosecution's case," *Glenn v. Bartlett,* 98 F.3d 721, 729 (2d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1116, 137 L.Ed.2d 317 (1997).

Even absent the challenged evidence, the case against Dunnigan strongly rebutted his alibi evidence that he was hundreds of miles away when the robbery occurred. For example, without any suggestive pretrial viewings, both Nuchereno and Smith identified Dunnigan's car as the car used in the robbery; and Smith, without any suggestion of taint, made an in-court identification of Dunnigan himself. Baes's identifications of Dunnigan as the man in the ATM videotapes and the voice on the answering machine were likewise entirely free of taint. The ATM tapes themselves were in evidence and available for inspection by the jury, which indeed requested such tapes during deliberations; and the jurors had Dunnigan before them in the courtroom and were able to make the comparison for themselves. Further, Baes's identification of Dunnigan's voice on Zielinski's answering machine at her unlisted telephone number was evidence that Zielinski's wallet had been in Dunnigan's possession. And both Dunnigan and the man using Zielinski's card had a sweatshirt with the reasonably distinctive legend, "Number One Dad."

In light of this evidence, we conclude that even if the admission of the challenged evidence were to be deemed a due process violation, the error in its admission must be deemed harmless.

## CONCLUSION

We have considered all of Dunnigan's arguments in support of the grant of habeas and have found them to be without merit. The judgment of the district court is reversed. The cause is remanded for the entry of judgment dismissing the petition.