# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-3952

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Carlous Lindell Daily, also known as | * | |
| "Los," | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: March 13, 2007
Filed: June 7, 2007

_____

Before SMITH, BOWMAN, and COLLOTON, Circuit Judges.

_____

SMITH, Circuit Judge.

Carlous Lindell Daily was convicted by a jury of one count of conspiracy to commit bank robbery, in violation of 18 U.S.C. § 371; one count of bank robbery, in violation of 18 U.S.C. §§ 2113(a) and (d); and one count of using a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1). Daily appeals his conviction, arguing that the district court[1] (1) erred in denying his motion to dismiss the indictment under the Interstate Agreement on Detainers Act (IADA) and (2) abused

_____

[1]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

its discretion in permitting the government to present evidence of a witness's pretrial identification. We affirm.

## I. *Background*

On November 6, 2003, a three-count indictment[2] was issued, charging Daily with (1) conspiring to commit armed bank robberies in Minnesota from January 2003 to March 2003, in violation of 18 U.S.C. § 371; (2) committing an armed bank robbery of an Excel Bank branch on January 29, 2003, in violation of 18 U.S.C. §§ 2113(a) and (d); and (3) committing an armed bank robbery of a U.S. Bank branch on March 28, 2003, in violation of 18 U.S.C. §§ 2113(a) and (d).

At the time of his indictment, Daily was incarcerated at High Desert Prison in Susanville, California, on unrelated charges. On December 12, 2003, FBI Special Agent David Rapp contacted High Desert Prison and requested that the prison put a detainer[3] on Daily. Three days later, prison officials advised Daily of the detainer and of his right to demand a speedy trial pursuant to California Penal Code § 1389—California's codification of the IADA.[4] After receiving notice, Daily contacted

---

[2]A second superseding indictment was returned on January 3, 2005, alleging that Daily used a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c), in both bank robberies.

[3]The IADA does not contain a definition of the word "detainer." *United States v. Mauro*, 436 U.S. 340, 359 (1978). "The House and Senate Reports, however, explain that '[a] detainer is a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction.'" *Id.* (quoting H.R. Rep. No. 91–1018, p. 2 (1970); S. Rep. No. 91–1356, p. 2 (1970); U.S. Code Cong. & Admin. News 1970, p. 4865).

[4]The IADA, 18 U.S.C. App. 2, § 2, is a compact among 48 states and the United States, which provides for a procedure by which a prisoner against whom a detainer has been filed can demand a speedy disposition of the charges giving rise to the detainer. *Id.* at Art. III.

his prison counselor to request a "disposition"—a demand for a speedy trial—but the counselor told Daily that he had to wait until he was released from disciplinary segregation to the general prison population before he could submit his request for a disposition to the warden.

Daily was released to the general prison population in February 2004. On March 25, 2004, Daily submitted to the warden's office a "Demand for Trial" under § 1389 in response to the Minnesota charges. Prison Official Deb Abbott, however, informed Daily that § 1389 did not apply in his case and returned Daily's demand to him. No one notified the United States Attorney's office or the United States District Court for the District of Minnesota that Daily had demanded a speedy trial.

Subsequently, Daily filed a motion to dismiss the indictment for failure to comply with the IADA, arguing that he was not tried within 180 days of submitting his demand as the IADA requires. The issue was submitted to a magistrate judge to determine whether the IADA had been followed. In his report and recommendation (R&R), the magistrate judge concluded, based on *Fex v. Michigan*, 507 U.S. 43 (1993), that even though Daily complied with the IADA, the 180-day IADA period does not commence until the prosecutor and the district court actually receive the written notice from the warden. Because neither the United States Attorney's office nor the district court received the written notice of Daily's request for disposition required by IADA until he filed his motion to dismiss on November 18, 2004, the 180-day IADA period commenced on November 18, 2004, not on March 25, 2004. The district court adopted the magistrate judge's R&R.

Daily also filed a motion to suppress any identifications. At the hearing on the motion, the government advised the magistrate judge that no identification techniques had been used with eyewitnesses to the bank robberies. The government also told the magistrate judge that it had interviewed individuals in California who were not eyewitnesses to the crime. The government represented that it did not intend to offer

identification evidence from these non-eyewitnesses but promised to notify defense counsel if that intention changed. In the R&R, the magistrate judge stated:

> Defendant moved to suppress any identifications of Defendant [#39]. The Government represents that it does not intend to offer evidence at trial from the California witnesses at issue. Based on this representation, Defendant's Motion to Suppress Any Identifications of Defendant [#39] should be denied without prejudice. Should the Government decide to offer evidence from any witness who was shown a photo of the Defendant, *the Defendant is entitled to a hearing well in advance of trial regarding whether the identification was unduly suggestive or otherwise reliable*.

(Emphasis added). The district court adopted the magistrate judge's R&R.

Thereafter, the government met with bank robbery victims prior to trial. Two witnesses separately advised the government that they might be able to identify the robber. To avoid the uncertainties of an initial identification occurring at trial, the government, on April 15, 2005, showed the two victims a six-person photo array that included Daily's photo. Tanya Simmer, a bank teller at the Excel Bank branch, narrowed the photos down to three, including Daily's photo. Days later, when the government asked Simmer if she would have any trouble testifying, she began to cry. Simmer then admitted that she had not been forthcoming. Simmer revealed her belief that she could identify one of the robbers from the photo array but had not previously done so out of fear.

On April 28, 2005, four days before trial, the government notified Daily of Simmer's revelation and that another witness, a former U.S. Bank security guard, identified Daily from a photo array as resembling one of the robbers. The notice also included agent reports and the photo arrays shown to the two witnesses. That same day, Daily filed ten separate motions in limine seeking, *inter alia*, preclusion of any identification testimony by the victims of the bank robbery as untimely disclosed.

On May 2, 2005, the scheduled trial date, the district court addressed the issues raised in Daily's in limine motions. Daily requested a continuance until May 4, 2005, to prepare for the trial, and the district court granted his request. In addition, Daily asked the district court to preclude the government from adducing evidence from the two witnesses identifying him as one of the robbers because of "lack of disclosure" of the eyewitnesses. Daily also argued that he was entitled to a pretrial hearing, pursuant to the magistrate judge's R&R, in the event that a witness was going to identify him in court. In response, the government informed the court that it "disclosed it promptly, and to the extent that the defendant thinks there is a basis for a suppression issue, he can obviously present that to the Court." After hearing the parties, the district court concluded that the government was not precluded from continuing its investigation and that the government made the evidence available to Daily as soon as it was known. The court also instructed Daily that the identifications could be challenged through cross-examination.

The government then sought guidance from the district court as to whether it should ask Simmer *in court* whether she recognized any of the robbers or whether it should provide her with a second opportunity to make an *out-of-court* identification from the photo array. Daily objected to an *in-court* identification without utilizing the *out-of-court* procedure. The district court permitted the government to show Simmer the photo array. Daily never objected to the government's out-of-court photo array as unduly suggestive. On May 3, 2005, the government notified Daily that Simmer identified him as one of the robbers from the photo array.

Daily's trial commenced the following day. Before trial, Daily moved to preclude Simmer's second identification. Daily contended that the magistrate judge's R&R entitled him to a pretrial hearing because the government had decided to present identification evidence at trial. According to Daily, Simmer's testimony about her out-of-court identification should be suppressed because he now had no opportunity to have a pretrial hearing. In response, the government pointed out that it promptly

notified Daily on May 3, 2005, that Simmer made the identification and provided Daily with the photo array. The government contended that the magistrate judge's R&R did not bar the identification evidence because it did not exist previously and was just acquired. Additionally, the government argued that as long as all of the facts were adduced at trial regarding the identification, including Simmer's inability to identify Daily on April 15, 2004, Daily would not be prejudiced. The government noted that Daily could raise any objections to the photo array procedures utilized. Daily's counsel then replied, "I ask, Your Honor, that they be precluded from using it [the identification] simply because we have not had a chance to contest it in pretrial." The district court rejected Daily's argument, explaining that Daily could cross-examine Simmer as to her inability two weeks ago to identify the robber from the photo array. The district court also found that because there was not "a successful identification until . . . very recently," the government "disclosed [it] promptly when it was done."

At trial, Simmer testified of her recollections of the robbery and identified Daily, over a defense objection, as one of the robbers. She stated that Daily gave orders during the robbery and wore a stocking hat and peach-tinted sunglasses. She testified that after she was momentarily locked in the vault room, Daily put his gun to her head and repeatedly asked her if she pushed the alarm button. She said that Daily looked her in the face on multiple occasions, so that she "saw him very clearly." She also recalled identifying Daily from a series of six photographs. She explained that she initially failed to identify Daily from the photo array due to fear but later requested to see the photo array again and then identified Daily. According to Simmer, she declined to pick Daily's photo at the first photo array because one of Daily's eyes was partially closed and looked slightly askew. She said that the man she saw in the bank, whom she identified as Daily, did not have a partially-closed eye.

The jury found Daily guilty of (1) conspiracy to commit bank robbery, (2) the Excel Bank robbery, and (3) using a firearm during the Excel Bank robbery.[5] Daily then moved for a new trial, arguing, *inter alia*, that (1) the district court improperly admitted evidence of Simmer's pretrial identification; (2) the pretrial identification of him by photographic array was suggestive and therefore should have been suppressed; (3) the verdict rested on the unreliable testimony of Simmer because showing Simmer the suggestive photographic display tainted her in-court identification of him; and (4) he was denied an opportunity to challenge her in-court identification in a pretrial hearing.

The district court denied Daily's motion for a new trial on all grounds. While Daily noted Simmer's failure to initially identify him in the photo array and argued that Simmer could not have adequately seen the robbers, the district court found that Daily failed to explain "how either of these factors rendered the photographic displays or any of the identification procedures suggestive." Because the district court concluded that the photo array was not suggestive, it likewise concluded that the display could not have rendered the pretrial identification unreliable. As a result, the district court found that Simmer's viewing of the photo array did not taint her in-court identification and rejected Daily's argument that the pretrial and in-court identification should have been suppressed.

The district court also rejected Daily's argument that Simmer's in-court identification should have been stricken because Daily was not provided an opportunity to challenge the identification in a pretrial hearing. The district court found that the government promptly notified Daily as soon as Simmer informed it that she was able to make an identification. Additionally, the district court postponed the start of trial to afford Daily the opportunity to prepare for Simmer's testimony. Thus,

[5]The jury acquitted Daily of the U.S. Bank robbery and the use of a firearm during the U.S. Bank robbery.

Daily had an adequate opportunity to challenge the admissibility of the in-court identification.

## II. *Discussion*

Daily raises two arguments on appeal. First, he asserts that the district court erroneously applied the IADA. Specifically, Daily contends that the 180-day period should have commenced when he submitted his demand to the prison warden. The district court, however, determined that the 180-day period commenced when the government and district court actually received the demand. Second, he contends that the district court abused its discretion and denied him his constitutional rights to due process and a fair trial when it allowed the government to present evidence of Simmer's pretrial identification without a pretrial suppression hearing.

## A. *IADA*

The IADA, 18 U.S.C. App. 2, § 2, is a compact among 48 states and the United States that establishes a procedure enabling a detainee to demand a speedy disposition of the charges giving rise to the detainer in the other jurisdiction. *Id*. at Art. III. If a prisoner requests a speedy disposition of the charges, the jurisdiction that filed the detainer must bring him to trial within 180 days. *Id*. at Art. III(a). A defendant "requests" a final disposition of an untried indictment against him by "caus[ing]to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information, or complaint . . . ." *Id*. The IADA instructs the prisoner to send his written notice and request for disposition "to the warden . . . who shall promptly forward it . . . to the appropriate prosecuting official and court . . . ." *Id*. at Art. III(b).

If a prisoner against whom a detainer has been lodged "requests" a "final disposition" of the relevant charges, he must be brought to trial within 180 days; otherwise, the relevant "indictment, information, or complaint shall not be of any

further force or effect, and the court shall enter an order dismissing the same with prejudice." *Id*. at Art. III(d).

We are not without guidance in the resolution of this issue. The Supreme Court has specifically held "that the 180-day time period in Article III(a) of the IAD[A] does not commence until the prisoner's request for final disposition of the charges against him has *actually been delivered* to the court and prosecuting officer of the jurisdiction that lodged the detainer against him." *Fex v. Michigan*, 507 U.S. 43, 52 (1993) (emphasis added). Daily offers no convincing argument that *Fex* does not control.

Here, neither party disputes that Daily gave written notice to the warden, completely fulfilling his obligation under the IADA. Prison officials, however, failed to forward his request to the United States Attorney's office and the district court. While this failure on the prison officials' part is unfortunate, it does not change the meaning of "actually been delivered." Actual delivery forecloses the type of constructive delivery that Daily seeks. We are bound by the Supreme Court's holding in *Fex* that the 180-day period does not commence until the prosecutor and the district court actually receive notice. Therefore, in Daily's case, the 180-day period commenced on November 18, 2004, when the United States Attorney and district court received written notice, not on March 25, 2004, when Daily delivered the written notice to the warden.

## B. *Pretrial Identification*

Daily's second argument is that the district court abused its discretion and denied Daily his constitutional rights to due process and a fair trial when it permitted evidence of Simmer's pretrial identification in the absence of a pretrial suppression hearing. Daily specifically asks this court to (1) recognize a defendant's right under the Due Process Clause of the Fifth Amendment to a pretrial hearing when the government seeks to use a pretrial identification; (2) hold, in the alternative, that Daily was entitled to a pretrial hearing under the specific facts of his case; and (3) hold that,

even in the absence of a pretrial hearing, Simmer's pretrial identification was unreliable and prejudiced her in-court identification.

### 1. *Per Se Right to a Pretrial Hearing*

Daily asks this court "to find that right exists in the Due Process Clause of the Fifth Amendment in all cases where the Government seeks to use pre-trial identification evidence." However, the Supreme Court has previously addressed the issue and held that "[a] judicial determination outside the presence of the jury of the admissibility of identification evidence may often be advisable. In some circumstances . . . such a determination may be constitutionally necessary. *But it does not follow that the Constitution requires a per se rule compelling such a procedure in every case*." *Watkins v. Sowders*, 449 U.S. 341, 349 (1981) (emphasis added). In fact, the Court noted that "cross-examination has always been considered a most effective way to ascertain truth." *Id*.

### 2. *Right to a Pretrial Hearing in Daily's Case*

In *Watkins*, the Supreme Court noted that, in some circumstances, a pretrial hearing on the admissibility of identification evidence may be constitutionally necessary. *Id*. Daily contends that his case presents just such circumstances. We disagree. Three decisions from our sister circuits provide guidance as to when a pretrial hearing is *not* "constitutionally necessary." In each case, the court found no pretrial hearing was required.

First, in *United States v. Davenport*, 753 F.2d 1460 (9th Cir. 1985), the Ninth Circuit held that a pretrial identification hearing was not necessary. In *Davenport,* a bank teller present at the time of a robbery was shown a photographic identification spread by a city police officer and identified the defendant. *Id*. at 1461. Subsequently, the government requested an identification lineup, mistakenly telling the district court that no witness had previously been asked to identify the robber. *Id*. After the lineup, the government learned that the bank teller had been shown a photographic spread and

informed the court and the defendant. *Id*. The defendant moved to suppress the lineup and requested that the court hold a hearing to determine the reliability of the anticipated in-court identification. *Id*. at 1461–62. The district court denied the defendant's motion, and the bank teller identified the defendant as the robber at trial. *Id*. at 1462. On appeal, the Ninth Circuit held that the defendant's case did not present "exceptional circumstances" requiring a pretrial hearing because "[t]he district court afforded [the defendant's] counsel the opportunity to probe the reliability of the identification evidence on cross-examination." *Id*.

Second, the Second Circuit, when faced with this issue, determined that while a pretrial identification was "highly suggestive" and that a pretrial hearing may have been preferable, it found "no indication that the basis for [the witness's] pretrial identification was not adequately explored within the framework of the *Neil v. Biggers* factors at trial." *Dunnigan v. Keane*, 137 F.3d 117, 129 (2d Cir. 1998). The court noted that the witness was cross-examined at length about (1) his identification of the perpetrator from the pictures he was shown; (2) his opportunity to see the perpetrator; and (3) his attention to the details of the perpetrator's appearance. *Id*. On that basis, the court held that "the proper factors were appropriately aired without a pretrial [ ]hearing." *Id*.

Finally, the Fourth Circuit determined that the district court did not abuse its discretion in denying a defendant's request for a pretrial hearing on his motion to suppress an undercover agent's pretrial identification of him. *United States v. Jackson*, 131 F.3d 137, 1997 WL 764523 (4th Cir. 1997) (unpublished). The court concluded that the defendant failed to demonstrate that he was entitled to a hearing, especially considering that the defendant had (1) knowledge of the undercover agent's identification prior to trial and (2) the opportunity to cross-examine the agent about his in-court identification. *Id*. at *3. Additionally, the court held that the district court did not err in refusing to suppress the undercover agent's in-court identification, even though the agent's drug buys with the defendant occurred two years prior to trial,

because the agent's testimony regarding his degree of certainty that the defendant was the perpetrator went "to the weight to be given to the identification, not its admissibility. Determination of the weight to be given evidence is a question for the jury, rather than a reason for the court to suppress an identification." *Id.* (citing *Watkins*, 449 U.S. at 447).

Like *Davenport*, *Dunnigan*, and *Jackson*, we see no circumstances in Daily's case indicating that a pretrial hearing was "constitutionally required." Here, the district court afforded Daily an adequate opportunity to cross-examine Simmer about her description of the robber, her out-of-court identification, and her in-court identification. As in *Jackson*, the government provided Daily with notice soon after Simmer identified him as the robber from the second photo array. The district court postponed the start of trial to afford Daily the opportunity to prepare for Simmer's testimony. Moreover, while Daily argues that the magistrate judge's R&R, adopted by the district court, entitled him to a pretrial hearing, Daily ignores the R&R language limiting the purpose of such a pretrial hearing to establish "whether the identification was unduly suggestive or otherwise reliable." At no time did Daily object to the out-of-court identification as "unduly suggestive or otherwise unreliable."

Therefore, we hold that no exceptional circumstances exist entitling Daily to a constitutionally mandated pretrial hearing on Simmer's identification.

### 3. *Suggestiveness and Reliability of Simmer's Identification*

Daily's final argument is that, even if a pretrial hearing on the admissibility of the identification was not constitutionally necessary, the record demonstrates that Simmer's out-of-court identification was unreliable and suggestive and produced an unreliable in-court identification.

As we previously noted, Daily never objected to the out-of-court identification as unreliable or unduly suggestive; instead, he objected to the identification based on

"untimely disclosure" and the magistrate judge's R&R stating that if the government decided to offer identification evidence, he would receive a pretrial hearing.[6] Because Daily failed to object based on the unreliability or suggestiveness of the out-of-court procedure, we review for plain error. *Rahn v. Hawkins*, 464 F.3d 813, 819 (8th Cir. 2006).

We employ a two-step analysis to determine whether an identification is unreliable. *United States v. Martin*, 391 F.3d 949, 952 (8th Cir. 2004). First, the defendant must establish that the photographic arrays shown to the witness were "impermissibly suggestive." *Id*. Second, if the photographic arrays were "impermissibly suggestive," then the court inquires "whether, under the totality of the circumstances of the case, the suggestive confrontation created a very substantial likelihood of irreparable misidentification." *Id*. (internal quotations and citations omitted). "Pared to its essence, the second inquiry is whether the identification is reliable." *Graham v. Solem*, 728 F.2d 1533, 1541 (8th Cir. 1984).

Here, Simmer was shown an array of photographs, not a single photograph. In addition, Simmer was shown the *same* photo array within a two-week period, not two separate photo arrays where the defendant was the only person appearing in both arrays.[7] We also note that the police did not continuously bombard Simmer with

_____

[6]In fact, when the government asked the court whether it should simply have Simmer do an in-court identification without utilizing an out-of-court identification procedure, Daily objected to the in-court identification without a prior out-of-court procedure.

[7]In determining whether a photo array was "impermissibly suggestive," we have held that "showing only a single suspect to the witness is the most suggestive and, therefore, the most objectionable method of pretrial identification." *United States v. Dailey*, 524 F.2d 911, 914 (8th Cir. 1975) (internal quotations and citations omitted). We have also noted that "[w]hile there is, of course, a greater risk of improper suggestion when a witness is shown a suspect in *two separate line-ups* as opposed to one, that is not to say that such pretrial identification procedures will always be

showups, lineups, and photo arrays until she identified Daily; instead, the authorities only conducted the second photo array after Simmer indicated her belief that she could identify the robber. *Cf. Neil v. Biggers*, 409 U.S. 188, 195 (1972) (finding suggestive an out-of-court procedure where a witness was shown, over the course of several months, "suspects in her home or at the police station, some in lineups and others in showups, and was shown between 30 and 40 photographs").

Therefore, we hold that the pretrial identification procedure was not impermissibly suggestive. Because the pretrial identification procedure was not impermissibly suggestive, we need not inquire as to the reliability of the identification. *Martin*, 391 F.3d at 952.

## III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____

impermissibly suggestive." *United States v. Gipson*, 383 F.3d 689, 698 (8th Cir. 2004) (emphasis added) (holding that, in case where the witness was shown two photographic line-ups where the defendant was "the only person appearing in both line-ups," and the witness was unable to identify the defendant in the first lineup because all of the men in the photos had hair that was too long, the lineups were not impermissibly suggestive, as the witness identified the defendant in the second lineup, which showed the defendant with shorter hair and less facial hair); *see also United States v. Johnson*, 56 F.3d 947, 954 (8th Cir. 1995) (holding that two "photo spreads" from which defendant was identified as carjacker were not unduly suggestive, even though defendant's photo was only photo included in both spreads and, thus, admitting identification testimony from photo spreads did not violate defendant's right to due process in carjacking prosecution, where photo spreads were comprised of people with similar physical characteristics as defendant, there was no prompting or suggestion from police officer on any occasion, and photo of man whom two witnesses had earlier identified as looking like carjacker was included in one of photo arrays).