**Robert L. SIMS, Petitioner,**

**v.**

**James STINSON, Respondent.**

**No. 97Civ.3388(KMW)(SEG).**

United States District Court,
S.D. New York.

May 30, 2000.

Robert L. Sims, Stormville, NY, pro se.

Alan Gadlin, Robert M. Morgenthau, Dist. Atty., New York, NY, for Respondent.

## OPINION & ORDER

KIMBA M. WOOD, District Judge.

*Pro se* petitioner challenges his state court convictions for felony murder and robbery through this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petition was referred to Magistrate Judge Grubin, who dealt with a number of preliminary matters; the Court hereby withdraws the reference. Petitioner alleges that his conviction was contrary to federal law on a number of grounds, most significantly that he was deprived of a fair trial by admission into evidence of a knife carried on his person, but never brandished or used, during the robbery and murder. For the reasons stated below, the Court denies the petition.

### I. *Background*

A. *The Crime, Investigation, and Trial*

On October 12, 1990 a jury convicted petitioner of murder in the second degree and robbery in the first and second degrees after trial in New York Supreme Court, New York County, before Justice Richard B. Lowe III. The evidence at trial showed that petitioner participated in an aborted drug transaction that escalated into a robbery and ultimately a murder. The State sought both robbery and murder convictions on the theory that petitioner acted in concert with the individual (the "stabber") who fatally stabbed the victim, Michael Fedorischak, after the stabber grabbed the money Fedorischak had offered for drugs.

At approximately four o'clock in the morning on Saturday, August 12, 1989, Fedorischak and his brother-in-law Greg Randolph drove from New Jersey into Manhattan in order to buy crack cocaine. Near the Port Authority Bus Terminal they met the stabber, who offered to sell them two vials of crack; because Randolph and Fedorischak wanted more crack, they allowed the stabber into their truck to direct them to a larger supplier. The stabber then brought them to a location on Eighth Avenue near 43rd Street, a well-known crack market at the time.

In response to the stabber's call, petitioner and another man, identified by his "lazy eye," approached the curb side of the truck, where Fedorischak was in the passenger seat; the stabber left the truck to join the others on the sidewalk. Petitioner offered to sell Fedorischak some crack cocaine, but an argument ensued over its price and quality. At some point, Fedorischak pulled several bills from his pocket and held the money in his fist. A scuffle ensued in the course of which petitioner grabbed Fedorischak's wrist, and the stabber seized the money. When Fedorischak moved to take back the money, the stabber

plunged a knife into his chest, inflicting a wound that later proved fatal.

During the incident Conrad Hunter, a member of the area's street life who was familiar with both petitioner and the man with the lazy eye, approached Fedorischak's truck, spoke briefly with Randolph, and then moved to the passenger side as the exchange escalated. After the stabbing, one of the men alongside the truck threatened Randolph, who then rapidly pulled the truck away from the curb to leave the scene and search for help. Hunter ran after the truck, which was quickly pulled over by a police patrol. With the assistance of Randolph and Hunter, police arrested petitioner the night of August 12, 1989, but the stabber was never found.

After his arrest and identification as a participant in the incident, petitioner made a videotaped statement describing the events and his role; the statement was played at trial. In this statement, petitioner describes an exchange between himself and the stabber, after Randolph and Fedorischak have driven off, in which petitioner felt threatened by and angry at the stabber; during this exchange, petitioner brandished a folding knife that he had been carrying in a "fanny pack" on his waist. The knife was recovered upon his arrest. Over defense objections, references to the knife were not redacted from the videotape played to the jury, the knife itself was admitted into evidence at trial, and the State argued to the jury that petitioner's possession of the knife demonstrated his intent to commit a violent crime.

The State's case at trial centered on the eyewitness testimony of Randolph and Hunter, the latter testifying pursuant to a cooperation agreement. A previous trial ended in a hung jury.

## B. *Procedural History*

Following entry of judgment on December 17, 1990, petitioner appealed his conviction to the Appellate Division, First De-

partment, contending that (1) there was insufficient evidence to establish petitioner's accomplice liability for the robbery, upon which the felony murder charges also relied, and that the trial court gave incorrect instructions on accomplice liability; (2) the trial court erred in allowing evidence of and argument concerning petitioner's folding knife; (3) Hunter's direct testimony should have been struck from the record because he invoked his privilege against self-incrimination on cross-examination; (4) the trial court incorrectly gave an interested-witness instruction with reference to petitioner's videotaped statement; and (5) the trial court incorrectly classified petitioner as a predicate felon for sentencing purposes.

The Appellate Division unanimously upheld petitioner's conviction, finding introduction of the knife evidence to have been harmless error, but it remanded for resentencing. *See People v. Sims,* 209 A.D.2d 192, 618 N.Y.S.2d 283 (1st Dep't 1994). The Court of Appeals then denied petitioner's application for leave to appeal the Appellate Division's decision. *See People v. Sims,* 84 N.Y.2d 1015, 622 N.Y.S.2d 927, 647 N.E.2d 133 (1994). On remand, petitioner was sentenced to concurrent prison terms of (1) from fifteen years to life, (2) from four to twelve years, and (3) from two and one-third to eight years; he is currently incarcerated.

Petitioner presents to this Court the same claims made before the Appellate Division. The petition is dated April 18, 1997 and was received in the Court's Pro Se Office on April 25, 1997. In a Report and Recommendation dated January 8, 1998, Magistrate Judge Grubin recommended dismissing the petition as untimely under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), *see Peterson v. Demskie,* 107 F.3d 92 (2d Cir. 1997) (allowing a "reasonable time" from the AEDPA's effective date, but not necessarily a full year, to file habeas corpus petitions challenging convictions that be-

came final prior to the AEDPA's effective date); Magistrate Judge Grubin subsequently vacated the Report on July 9, 1998, following the Second Circuit's clarification that any petition filed by April 24, 1997 is timely under the AEDPA. *See Ross v. Artuz,* 150 F.3d 97 (2d Cir.1998). The Court adopts Magistrate Judge Grubin's inference that, given its arrival on April 25, 1997, the petition was timely filed under *Ross. See Dory v. Ryan,* 999 F.2d 679, 681 (2d Cir.1993) (holding that the date of "filing" for *pro se* incarcerated litigants is the date the submission is delivered to prison officials for mailing).

## II. *Discussion*

As detailed below, all but one of petitioner's claims are procedurally barred by his failure on direct appeal to pursue them to the New York Court of Appeals. His claim regarding introduction of the knife evidence was properly exhausted but fails on its merits, although not without raising substantial questions concerning the fairness of the trial.

### A. *Standard for Habeas Corpus Relief*

■ A federal district court may issue a writ of habeas corpus on behalf of a person incarcerated pursuant to a state criminal conviction only when that custody violates "the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Petitioner bears the burden of proving such a violation by a preponderance of the evidence. *See Jones v. Vacco,* 126 F.3d 408, 415 (2d Cir.1997). Habeas corpus relief may not be granted unless petitioner has first exhausted his state court remedies. *See* 28 U.S.C. § 2254(b). Pursuant to the AEDPA, a claim already adjudicated on its merits in state court may not be the basis for federal habeas relief unless the state court's legal conclusions were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," *id.* § 2254(d)(1), or its factual determinations were "unreasonable ... in

light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).

### B. *Exhaustion of State Remedies*

As respondent concedes, petitioner properly exhausted his state remedies regarding the knife evidence. (Memorandum of Law In Support of Answer Opposing Petition For A Writ of Habeas Corpus ("Resp. Mem.") at 14.) On appeal, petitioner presented his theory that admission of the knife evidence violated his federal constitutional right to a fair trial, (Appendix In Support of Answer Opposing Petition for a Writ of Habeas Corpus ("App."), Exh. A, Brief for Defendant–Appellant ("Petit.Brief") at 45), and he subsequently sought the Court of Appeals' leave to appeal the Appellate Division's ruling that admission of the knife evidence was harmless error. (App., Exh. E, Criminal Leave Application ("Leave Appl.").)

■ With respect to the other three claims (the "three claims"), however, petitioner's application for leave to appeal contained no more than a vague closing offer to "respond at your convenience" to "any questions about this [the knife] issue, or the other issues raised in this case." (Leave Appl. at 3.) Because petitioner may neither file a second application for leave to appeal nor seek collateral relief in state court based on claims addressed on their merits on direct appeal, *see Bossett v. Walker,* 41 F.3d 825, 829 (2d Cir.1994); *Grey v. Hoke,* 933 F.2d 117, 120 (2d Cir. 1991), the three claims are also deemed to be exhausted. *See Bossett,* 41 F.3d at 829; *Grey,* 933 F.2d at 120.

■ When, however, a habeas corpus petitioner exhausts his state remedies only by defaulting on an opportunity to pursue further relief on the merits, "the procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause

and prejudice for the default." *Gray v. Netherland,* 518 U.S. 152, 162, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996). Here, petitioner defaulted on his opportunity to raise the three issues before the Court of Appeals by making no more than a passing allusion to "other issues." Court of Appeals Rule 500.10(a) requires that criminal leave applications "identify the issues on which the application is based." General references to "other issues" are insufficient to apprise the Court of Appeals of the factual and legal grounds of those issues. *See Thebner v. Miller,* 788 F.Supp. 714, 717 (E.D.N.Y.1992); *Marrero v. Keane,* No. 93 Civ. 3573(PKL), 1995 WL 66660, *1 (S.D.N.Y. Feb. 16, 1995); *cf. Grey,* 933 F.2d at 120 (holding that petitioner failed to preserve for habeas review those claims raised in appellate brief attached to application for leave to appeal but not mentioned in the application letter itself).

Petitioner offers no cause for his failure to raise the three claims with more specificity, and no cause is apparent from the record. *See Bossett,* 41 F.3d at 829 (noting that legitimate grounds for default are ineffective assistance of counsel, state interference with compliance, and claims not reasonably available to counsel at the time of default). Therefore, the Court finds that petitioner defaulted on the three claims without good cause and does not reach their merits. *See Grey,* 933 F.2d at 121 (holding that claims on which petitioner procedurally defaults "must ... be dismissed without reaching the merits"); *Bossett,* 41 F.3d at 829 (same).

C. *Improper Admission of the Knife Evidence*

Petitioner claims that admission of the knife evidence violated the Due Process Clause of the Fourteenth Amendment because it had the sole purpose of suggesting his propensity for violence. The prosecutor's summation allegedly exacerbated this impropriety through the following argument:

> What would you have a knife for? The answer is, you'd have a knife to use force if it was necessary to do the things you had to do. Otherwise there's no need to carry a knife. It shows that he was ready to use additional force himself, if necessary, and that he knew force was a real possibility of what might happen.

(October 10, 1990 Trial Transcript of People v. Sims, No. 9315–89, before Hon. Richard B. Lowe III ("Trial Trans.") at 414–15.) The Appellate Division rejected petitioner's argument on its merits, and although the Court considers the question a close one, the state court's decision was not unreasonable. Accordingly, petitioner's application for the writ must be denied.

1. The Appellate Division's Decision on the Merits

The knife evidence claim is governed by § 2254(d)(1) because it was rejected on its merits in state court. The Appellate Division held that it was error to admit the knife because it "had no connection to the murder and did not tend to establish defendant's intention to commit a robbery." 618 N.Y.S.2d at 284. The Appellate Division also held that this error was harmless, however, "in view of defendant's videotaped statement admitted at trial in which he admitted possessing the knife and threatening to use it against the stabber, and in the absence of any suggestion at trial that the knife was the murder weapon." *Id.*

 By framing the issue in terms of harmless error, the Appellate Division's decision gave explicit attention only to the state law aspect of petitioner's appeal and did not specifically address its constitutional dimension.[1] Nonetheless, the court

---

1. As discussed below, whether erroneous application of state evidentiary rules violated due process depends in part on the likelihood that the error altered the proceeding's outcome; accordingly, the extent of any harm is

clearly considered the underlying issue and rejected the knife evidence claim on its merits; such a general denial, even absent separate analysis of the federal principles governing the claim, is an "adjudication on the merits" for § 2254(d)(1) purposes. *See Weeks v. Angelone,* 176 F.3d 249, 259 (4th Cir.1999), *aff'd on other grounds,* — U.S. —, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000).

2. Habeas Review of State Court Decisions

■ As amended by the AEDPA, § 2254(d)(1) provides that a habeas petition may be granted only when "the relevant state-court decision was either (1) 'contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) 'involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States.'" *Williams v. Taylor,* — U.S. —, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000). The "contrary to" prong applies when either (a) "the state court applies a rule that contradicts the governing law set forth in" Supreme Court precedent, or (b) "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Id.* at 1519–20. Because, as explained below, the Supreme Court neither has ruled on any case in which allegedly prejudicial character evidence was admitted without any relevance to proof of the crimes charged, nor has clearly established the rule of law governing such a case, petitioner is not entitled to relief under either established interpretation of the "contrary to" prong.

■ The substantial question presented by this petition is how the claim fares under the "unreasonable application" prong. The *Williams* Court established that when "[a] state-court decision ... correctly identifies the governing legal rule,"

this prong of § 2254(d)(1) allows habeas relief if the state court then "applies [the rule] unreasonably to the facts of a particular prisoner's case." *Id.* at 1520. To find the state court decision unreasonable, the federal habeas court must do more than simply conclude that it would reach a different result upon an independent review; it may issue the writ only if "the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 1521.

The *Williams* Court left open, however, whether federal habeas review is as deferential when the alleged state court error involves the resolution of previously unanswered questions of federal law. *See id.* at 1521. After considering the Fourth Circuit's approach of granting the petition when "state-court decisions ... unreasonably extend a legal principle ... to a new context where it should not apply (or unreasonably refuse to extend a legal principle to a new context where it should apply)," the Court commented only that this approach "may perhaps be correct" and that it may "be difficult to distinguish a decision involving an unreasonable extension of a legal principle from a decision" that is "contrary to" the relevant precedent. *Id.* at 1521 (discussing *Green v. French,* 143 F.3d 865, 869–70 (4th Cir. 1998)). Accordingly, it remains an open question whether in such cases the habeas court applies its independent judgment as to the correct rule of law or merely scrutinizes the state court decision for objective unreasonableness. *See generally Matteo v. Superintendent, SCI Albion,* 171 F.3d 877, 885–87 (3d Cir.1999) (discussing Circuit split on the question of whether de novo or more deferential review applies to purely legal issues regarding extension of existing precedent); *see also Smalls v. Batista,* 191 F.3d 272, 278 (2d Cir.1999) (declining to construe § 2254(d)(1) definitively pending issuance of the Supreme Court's opinion in *Williams* ). This Court

part of the assessment of whether there was any constitutional error.

need not decide this question here because the relevant rule of law, although not specifically established by the Supreme Court, is not subject to reasonable dispute for the reasons discussed below.

### 3. The Due Process Standard

■ The sole issue before the Court is whether admission of the knife evidence violated federal constitutional guarantees of due process. Because the federal courts have no authority to review issues of state law, erroneous application of state evidentiary rules alone does not merit habeas relief. *See Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *Dunnigan v. Keane,* 137 F.3d 117, 125 (2d Cir.1998).

■ A state criminal trial may be "so infused with unfairness as to deny due process of law," *Estelle,* 502 U.S. at 75, 112 S.Ct. 475 (quoting *Lisenba v. California,* 314 U.S. 219, 228, 62 S.Ct. 280, 86 L.Ed. 166 (1941), but the introduction of improper evidence does not deprive a defendant of due process "unless the evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice.'" *Dunnigan,* 137 F.3d at 125 (quoting *Dowling v. United States,* 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990)). Only a very narrow class of infractions violates fundamental fairness. *Dowling,* 493 U.S. at 352, 110 S.Ct. 668.

■ Under current Second Circuit authority, improperly admitted evidence renders a trial fundamentally unfair if three conditions are met. First, such evidence can render a trial fundamentally unfair only if it is not " 'probative of [any] essential element' in the case." *Dunnigan,* 137 F.3d at 125 (quoting *Estelle,* 502 U.S. at 69, 112 S.Ct. 475). Here, the Appellate Division determined that the knife evidence was not probative of any element of the crimes charged, and this Court must accept its interpretation of the applicable New York law of evidence and substantive crimes. Consequently, petitioner's argu-

ment does not run afoul of *Estelle'*s admonition that "nothing in the Due Process Clause of the Fourteenth Amendment requires the State to refrain from introducing relevant evidence." 502 U.S. at 70, 112 S.Ct. 475.

Second, petitioner must have preserved his claim through contemporaneous objection. *See Dunnigan,* 137 F.3d at 126 (concluding that due process claim had been waived because, at trial, petitioner neither objected to the testimony in question nor requested a limiting instruction). Here, defense counsel repeatedly objected to introduction of the knife evidence both before and during trial.

■ Third, admission of "unfairly prejudicial evidence" violates the due process right to a fair trial only when it is "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Dunnigan,* 137 F.3d at 124 (quoting *Johnson v. Ross,* 955 F.2d 178, 181 (2d Cir.1992)). The Second Circuit thus applies to improper admission of evidence the same due process standard that the Supreme Court has applied to improper exclusion of evidence. *See Collins v. Scully,* 755 F.2d 16, 18–19 (2d Cir.1985) (discussing applicability of *United States v. Agurs,* 427 U.S. 97, 108, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), "when evidence is erroneously admitted"). Only improper introduction of evidence that is "crucial, critical, highly significant" violates the due process clause. *Id.* (quoting *Collins v. Scully,* 755 F.2d 16, 19 (2d Cir.1985)). Because *Dunnigan* dealt with introduction of evidence of past crimes, this test clearly applies to allegations of unfair introduction of character evidence. *See id.* at 126 (addressing testimony identifying petitioner as a felon and referring to his incarceration at Attica Correctional Facility).

■ Respondent contends in essence that the *Dunnigan* standard is inapplicable because it was not "clearly established Federal law, as determined by the Su-

preme Court of the United States" at the time petitioner's conviction became final.[2] 28 U.S.C. § 2254(d)(1). On respondent's view, the Appellate Division's decision could not have been unreasonable because "it is an open question whether admission of propensity evidence could ever constitute a due process violation." (Resp. Mem. at 10.) Although the Supreme Court has not specifically ruled on this issue, the Court nonetheless concludes that it is not an "open question": it would be an objectively unreasonable interpretation of Supreme Court precedent to conclude that admission of propensity evidence can never violate due process.

*Dunnigan* applied well-established principles governing due process claims arising from erroneously admitted evidence, principles that apply with particular force in the context of character evidence. These principles concerning erroneously admitted character evidence extend to the knife evidence at issue here.

a. The General Rule Governing Improper Admission of Character Evidence

 The general rule of law–that unfairly prejudicial evidence renders a trial fundamentally unfair when there is a reasonable probability that without it the verdict would have been different–was firmly established by 1994 when the Appellate Division affirmed petitioner's conviction and the Court of Appeals denied him leave to appeal further. In *Collins v. Scully*, 755 F.2d 16 (2d Cir.1985), and *Johnson v. Ross*, 955 F.2d 178 (2d Cir.1992), the Second Circuit announced this standard in decisions involving improper admission of hearsay but without any limitation to that context; instead, *Collins* set out the standard applicable to "erroneously admitted evidence" generally. 755 F.2d at 19. At least five other circuits follow similar rules, *see, e.g., Nettles v. Wainwright*, 677 F.2d 410, 414–15 (5th Cir.1982); *Hobbs v. Lockhart*, 791 F.2d 125, 127–28 (8th Cir.1986); *McKinney v. Rees*, 993 F.2d 1378, 1385–86 (9th Cir.1993); *Duvall v. Reynolds*, 139 F.3d 768, 788 (10th Cir.1998); *Dobbs v. Kemp*, 790 F.2d 1499, 1504 (11th Cir.1986), and this approach has been consistently and widely applied to claims of improperly admitted character evidence. *See, e.g., Wheel v. Robinson*, 34 F.3d 60, 66 (2d Cir.1994); *Lucas v. Johnson*, 132 F.3d 1069, 1082 (5th Cir.1998); *Hobbs*, 791 F.2d at 127–28; *McKinney*, 993 F.2d at 1385–86; *Duvall*, 139 F.3d at 788; *Dobbs*, 790 F.2d at 1504.[3] Unanimity among numerous courts of appeals suggests, but does not establish, that an opposing view is unreasonable. *Cf. Williams*, 120 S.Ct. at 1522 (mere existence of conflicting authorities does not bar the conclusion that one is unreasonable).[4]

**2.** Respondent makes this argument both under the AEDPA and the Supreme Court's pre-AEDPA non-retroactivity jurisprudence. *See Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). With the exception of circumstances not present here, the AEDPA is at least as restrictive as *Teague*, *see Williams*, 120 S.Ct. at 1523; *Ramdass v. Angelone*, 187 F.3d 396, 406 & n. 4 (4th Cir. 1999); *Fisher v. State of Texas*, 169 F.3d 295, 304 (5th Cir.1999); *O'Brien v. Dubois*, 145 F.3d 16, 23–24 (1st Cir.1998); accordingly, the Court will not address *Teague* separately.

**3.** Respondent offers as contrary authority *Stomner v. Kolb*, 903 F.2d 1123 (7th Cir. 1990), in which the court's entire analysis of the due process issue consisted of the following two sentences: "We find that this questioning did not create a fundamentally unfair trial. The introduction of improper evidence of other crimes will not support a grant of the petitioner's writ of habeas corpus." *Id.* The Court construes *Stomner* to conclude only that character evidence did not render "the petitioner's" trial fundamentally unfair, not to announce so casually that it could never do so. This interpretation is supported by *Stomner's* citation to only *United States ex rel Searcy v. Greer*, 768 F.2d 906 (7th Cir.1985), which merely held "[t]he other crimes evidence *in this case* did not create a fundamentally unfair trial." *Id.* at 910 (emphasis added).

**4.** Additionally, courts have consistently applied this rule to habeas petitions challenging improper admission of evidence, without concern for whether it constituted a "new rule" under the non-retroactivity principle of *Teag-*

This consensus is consistent with the Supreme Court's strong suggestions that improper admission of character evidence may deprive a criminal defendant of a fundamentally fair trial. Past decisions recognize that our legal tradition rejects inferring guilt from evidence of propensity toward violence or criminality. *See Michelson v. United States*, 335 U.S. 469, 475, 69 S.Ct. 213, 93 L.Ed. 168 (1948) ("Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt."). The due process clause protects just such principles that "define the 'community's sense of fair play and decency,'" *Dowling*, 493 U.S. at 353, 110 S.Ct. 668 (quoting *United States v. Lovasco*, 431 U.S. 783, 790, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977) (quoting *Rochin v. California*, 342 U.S. 165, 173, 72 S.Ct. 205, 96 L.Ed. 183 (1952))), principles developed through "long experience in the common-law tradition ... to safeguard men from dubious and unjust convictions, with resulting forfeitures of life, liberty, and property," *Brinegar v. United States*, 338 U.S. 160, 174, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). The rule against using character evidence to show criminal propensity "is one such historically grounded rule of evidence." *McKinney*, 993 F.2d at 1381 (surveying history and current prevalence of rules against character evidence).

The Supreme Court's decisions upholding particular uses of evidence of past wrongs reflect an attempt to balance the impropriety of propensity inferences with States' legitimate efforts to admit such evidence for other, proper purposes. The care taken to distinguish legitimate from illegitimate purposes, and to prevent the jury from drawing propensity inferences

from evidence admitted for another purpose, both suggest that such propensity inferences are themselves constitutionally suspect. In *Spencer v. Texas*, 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967), for instance, the Court upheld a Texas statute allowing introduction of evidence of past crimes, but the Court relied on (1) such evidence's relevance to the jury's application of Texas' habitual offender statute, and (2) the mandatory jury instruction limiting use of the evidence to proof of habitual offender status and excluding its use as proof that defendant committed the crime charged. *See id.* at 555, 563, 87 S.Ct. 648. Chief Justice Warren observed that it is "well established that evidence of prior convictions may not be used by the State to show that the accused has a criminal disposition and that the probability that he committed the crime currently charged is increased," and that nothing in the majority opinion implied that it would be "consistent with due process [to admit] prior-crimes evidence for no purpose other than what probative value it has bearing on an accused's disposition to commit a crime currently charged." *Id.* at 572, 575–76, 87 S.Ct. 648 (Warren, C.J., concurring in part and dissenting in part). The same approach animates *Estelle*, in which the Court found no due process violation both because the contested evidence was probative of an element of the crime charged and because the trial court's instructions directed the jury's attention to this relevance while specifically warning against drawing a propensity inference. *See* 502 U.S. at 70, 75, 112 S.Ct. 475; *see also Dowling*, 493 U.S. at 353, 110 S.Ct. 668. The Court's insistence on jury instructions warning against propensity inferences

---

ue v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). *See, e.g., Dunnigan*, 137 F.3d 117; *McKinney*, 993 F.2d 1378 (granting habeas petition based on improper admission of character evidence); *Geraci v. Senkowski*, 23 F.Supp.2d 246, 266 (E.D.N.Y.1998) (defendant's brother's bad acts). Although an "old rule" under *Teague* generally constitutes

"clearly established Federal law" under § 2254(d)(1), *see Williams*, 120 S.Ct. at 1523, the congruence is imperfect because the AEDPA standard restricts the relevant source of law to Supreme Court authority. *Cf. Ciak v. United States*, 59 F.3d 296, 303 (2d Cir.1995) (referring to circuit court decisions as relevant precedent).

makes sense only if such inferences are constitutionally infirm.

Against this conclusion, respondent primarily offers a footnote from *Estelle*, in which the Court disclaimed any "opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime." 502 U.S. at 75 n. 5, 112 S.Ct. 475; *see also id.* at 70, 112 S.Ct. 475 (declining to "explore further" whether admitting "evidence that is not relevant" violates due process). At most, this remark suggests that it is an open question whether admitting otherwise irrelevant propensity evidence *always* violates due process,[5] but a much narrower rule is at issue here: admission of such evidence violates due process only when there is a reasonable probability that it overcame what would, in its absence, have been a reasonable doubt.

### b. The Knife Evidence as Character Evidence

The principles governing evidence improperly admitted to establish propensity apply here, notwithstanding that the evidence in question concerned a knife in defendant's possession at the time of the murder. The bar on proof of violent or criminal propensity historically has applied to numerous forms of evidence about character, *see, e.g., Michelson*, 335 U.S. at 475, 69 S.Ct. 213 ("The State may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors ...."), including defendant's possession of weapons. *See People v. Zackowitz*, 254 N.Y. 192, 172 N.E. 466, 467–68 (1930) (Cardozo, C.J.) ("[O]wnership of weapons ... has relevance only as

indicating a general disposition to make use of them thereafter, ... [which is] without relevance except as indicating a 'desperate type of criminal,' a criminal affected with a murderous propensity."). In *McKinney*, for instance, the Ninth Circuit analyzed evidence concerning petitioner's knife collection and fascination with knives as follows:

> [t]he only inference the jury could have drawn from such evidence is that ... he was the type of person who would own a knife. The evidence thus was evidence of another act offered to prove character and giving rise to a propensity inference, and did not tend to prove a fact of consequence.

993 F.2d at 1382–83.

Although weapon possession during a crime can have a significance different from possession at other times, any such significance stems only from a connection to the crime itself, such as identifying the possessor of a weapon used during the crime, showing that defendant was capable of having committed the crime, or showing the existence of a preconceived design. *See, e.g., McKinney*, 993 F.2d at 1383–84 (finding that evidence of knife possession at the time of the murder was relevant to determining which of two suspects was the killer when the knife in question could have been the murder weapon); *Zackowitz*, 172 N.E. at 468. Here, however, the Appellate Division found petitioner's possession of a folding knife in his fanny pack irrelevant to the crimes charged.

Absent such relevance, the jury was left to infer that petitioner was simply the type of person who carries a knife. Indeed, the State specifically argued that someone who carries a knife is the type of person likely

---

**5.** A state law allowing such evidence would be unconstitutional only if "invalid in toto–and therefore incapable of any valid application," *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n. 5, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (quoting *Steffel v. Thompson*, 415 U.S. 452, 474, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974)); *see also United States v. Salerno*, 481 U.S. 739, 745,

107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Moreover, declining to decide an issue may indicate mere adherence to the policy of "avoiding the premature adjudication of constitutional questions," *Clinton v. Jones*, 520 U.S. 681, 690, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997), not that the issue's resolution is legally uncertain.

to put it to criminal use.[6] Such inferences from criminal or suspicious acts to propensity to commit the crimes charged are precisely what the traditional ban on character evidence is designed to prevent. *See People v. Johnson,* 61 A.D.2d 923, 403 N.Y.S.2d 11, 12 (1st Dep't 1978) (holding that admission of a pipe that was in defendant's possession during a murder, but that was not the murder weapon, "was gravely prejudicial and seriously impaired the fundamental fairness of the trial" because it "invite[d] the jury to infer that someone carrying it would be disposed to strike another over the head with a blunt instrument").

### c. Conclusion

The Supreme Court has consistently required that admission of evidence susceptible to propensity inferences be relevant for another purpose and that the jury receive instruction limiting its consideration of the evidence to that purpose, and the appellate courts have embraced due process scrutiny for improperly admitted character evidence. Accordingly, the Court concludes that it would have been objectively unreasonable for the New York state courts to have rejected petitioner's claim on the ground that admission of otherwise irrelevant character evidence can never violate due process. Instead, the decisive question is how the standard articulated in *Dunnigan*—the extension of *Agurs* to cover improper admission of otherwise irrelevant character evidence—applies to the facts of this case.

### 4. The Knife Evidence's Impact on the Trial's Fairness

 In reviewing a state court's application of federal law to the facts of petitioner's case, the Court's role is to determine whether the state courts' ultimate denial of petitioner's claims was un-

reasonable, regardless of whether the Court agrees that it was correct. *See Williams,* 120 S.Ct. at 1521–22. Although petitioner's claim has merit, it is reasonable to conclude that introduction of the knife evidence did not deprive petitioner of a fair trial.

 The erroneous introduction of the knife evidence would have been an error of constitutional magnitude if, "in light of the entire record before the jury," it "was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it. In short, it must have been crucial, critical, highly significant." *Collins v. Scully,* 755 F.2d 16, 19 (internal citations and quotation marks omitted); *accord Dunnigan,* 137 F.3d at 125. This standard of materiality is the same as that applicable to improperly suppressed evidence, *see* 755 F.2d at 18 (applying *Agurs,* 427 U.S. at 111–13, 96 S.Ct. 2392 to improperly admitted evidence), and it requires only "a reasonable probability" of a different result absent the prejudicial evidence, *see Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). "The question is not whether the defendant would more likely than not have received a different verdict [absent] the evidence, but whether in its [presence] he received a fair trial, understood as a trial worthy of confidence." *Id.*

This test examines both the extent of the knife evidence's prejudicial effect at trial and the strength of the other evidence. As the Supreme Court explained in *Agurs,* "[i]f there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to

---

6. The Court notes that the State did not charge petitioner with criminal possession of a weapon or otherwise suggest that possession of the knife was illegal. *See* N.Y. Penal

Law § 265.01(2) (making it a crime to possess a "dangerous knife ... with intent to use the same unlawfully against another").

create a reasonable doubt." 427 U.S. at 112, 96 S.Ct. 2392.

■ In order to evaluate the probability of an acquittal or mistrial absent the prejudicial evidence, the Court necessarily must consider the weight of the other evidence, not merely its legal sufficiency. *See Kyles,* 514 U.S. at 434, 115 S.Ct. 1555. To do so, the Court undertakes an "independent review of the record" in assessing materiality, *see United States v. Orena,* 145 F.3d 551, 558 (2d Cir.1998) (quoting *United States v. Payne,* 63 F.3d 1200, 1209 (2d Cir.1995)), and this review extends to assessments of witness credibility, notwithstanding the difficulty of that task. *See Cuevas v. Washington,* 36 F.3d 612, 620–21 (7th Cir.1994); *see also Kyles,* 514 U.S. at 443, 115 S.Ct. 1555 (noting that "[a] jury would reasonably have been troubled by the adjustments to" a witness' story over time); *Hassine v. Zimmerman,* 160 F.3d 941, 959 (3d Cir.1998) (noting that a witness' testimony was "not likely to be viewed as credible").

### a. Pervasiveness of the Knife Evidence At Trial

The knife evidence was a prominent but not dominant theme throughout the trial. The State (1) noted in its opening statement that petitioner "had a knife with him" when he was arrested, (10/9/90 Trial Trans. at 27); (2) played for the jury petitioner's uncounseled, post-arrest videotaped statement, including portions in which he described chasing the stabber with the folding knife in hand,[7] (10/10/90 Trial Trans. at 312–13; People's Exh. 7 (the "Tape") at 9:00:25–45); (3) elicited testimony from the arresting officer con-

cerning his discovery of the knife in petitioner's fanny pack, (10/10/90 Trial Trans. 313–14); and (4) introduced the knife itself as physical evidence, (*id.* at 314). The State's summation focused on the relationship between the knife evidence and petitioner's intent, noting that "He's out on sort of a mean street, and he has this with him" and asking "what does this tell you about his intent?" (*id.* at 414); the State urged the jury to conclude that possession of the knife "shows you that he was ready to use additional force himself." (*Id.* at 415.) During its deliberations, the jury again viewed the videotaped statement with its references to the knife. (10/12/90 Trial Trans. at 507–08.)

The knife evidence received far more than a "brief mention" buried in the midst of otherwise relevant evidence, unlike the *Dunnigan* parole officer's testimony concerning "felons" and "Attica." 137 F.3d at 126. Moreover, the introduction of the weapon itself greatly heightened its salience to the jury, especially where, as here, there was no other physical evidence. *See United States v. DeVillio,* 983 F.2d 1185, 1194–1195 (2d Cir.1993) (noting the "persuasive visual display" by which defendants' burglars' tools improperly suggested their criminal character). The knife evidence was not, however, nearly as pervasive and "emotionally charged" as that in *McKinney,* where the prosecution developed over 60 pages of testimony regarding petitioner's knife possession in order to paint an "image of a man with a knife collection, who sat in his dormitory room sharpening knives, scratching morbid inscriptions on the wall and occasionally ven-

7. The trial court rejected petitioner's motion to redact from the statement references to the knife. (10/9/90 Trial Trans. at 2–4.) Both the trial court and the Appellate Division suggested that petitioner's references to the knife in his statement mitigated the unfairness of admitting the knife evidence. (10/10/90 Trial Trans. at 322; 618 N.Y.S.2d at 284.) The Court disagrees; a criminal defendant's uncounseled post-arrest statement does not commit him to any position at trial on the admis-

sibility of evidence, especially when defendant objects to admitting the statement itself. *See United States v. Stewart,* 576 F.2d 50, 55 (5th Cir.1978) ("[E]vidence of a defendant's prior crimes is not rendered admissible because it was contained in a voluntary confession."); *United States v. Wiggins,* 509 F.2d 454, 462 (D.C.Cir.1975) (rejecting notion that "the scope of the evidence at trial would depend upon the extent of the defendant's garrulity when confessing").

turing forth in camouflage with a knife strapped to his body." 993 F.2d at 1385.

b. The Strength of the Other Evidence

At trial, the prosecution invoked the knife evidence to bolster the weakest element of its case: whether petitioner acted in concert with the stabber to rob Fedorischak. No evidence adduced at trial suggested that petitioner personally had robbed Fedorischak; his conviction relied upon a theory of accomplice liability under New York Penal Law 20.00, as respondent readily agrees, (Resp. Mem. at 22). The jury instructions explained that the two robbery counts required the jury to decide whether petitioner, acting with others, forcibly took Fedorischak's property with the intent to permanently deprive him of it. (10/11/90 Trial Trans. at 473–75.) Once the jury found petitioner guilty of one or more of the robbery counts, the jury could then convict petitioner of felony murder if it found that a participant in the robbery caused Fedorischak's death. (*Id.* at 477.)

To find accomplice liability, the jury had to conclude that petitioner intentionally aided the robbery and shared the mental culpability necessary for the crime. (*Id.* at 466.) The State had to show that petitioner acted in concert with the stabber in robbing Fedorischak, not merely in the attempted narcotics sale. (*Id.* at 489.) The required mental state was intent to take property, permanently deprive the owner of that property, and use or threaten force in order to take the property or overcome resistance to its taking. (*Id.* at 466, 471–72.) Petitioner not only must have intended to rob, but he also must have intended to act jointly with the stabber rather than strictly "as an individual entrepreneur" in a chaotic situation. (*Id.* at 489.)

The evidence was strong that petitioner and the stabber acted in concert in the attempted crack sale. There was corroborated, uncontradicted testimony that (1) the stabber directed Fedorischak and Randolph to the petitioner's street-corner, (2) petitioner responded to the stabber's call, and (3) the stabber and petitioner cooperated in the argument with Fedorischak concerning the price and quality of the crack. (10/9/9 Trial Trans. at 80–81, 87 (Randolph); *id.* at 176 (Hunter)).

Whether that community of purpose extended to robbery, however, was much less clear. The proof of such purpose divides into relatively strong evidence concerning petitioner's grabbing of the victim's hand, and weaker evidence concerning minor details to which only Hunter testified.

(1) The Grabbing Evidence

Randolph's and Hunter's trial testimony, as well as petitioner's videotaped statement, all agreed that after Fedorischak had taken money out of his pocket, petitioner grabbed Fedorischak's wrist and the stabber grabbed the money. Hunter and Randolph testified that petitioner acted first, but petitioner stated that he reacted to the stabber's grab. (*Id.* at 88–89 (Randolph), 178–80 (Hunter); Tape at 8:52:40–55.) Although petitioner's grabbing of Fedorischak's wrist is consistent with an intention to facilitate the stabber's seizure of the money, it is also consistent with an intention to forestall that seizure [8] or to begin petitioner's own attempt to take the money.

Randolph's and Hunter's testimony that petitioner continued to restrain Fedorischak during and after the stabber's forcible removal of the money from Fedorischak's hand, however, provides stronger evidence of a shared intent to rob. (10/9/9 Trial Trans. at 89 (Randolph), 179–80 (Hunter)). *See People v. Sims,* 618 N.Y.S.2d at 284; *see also People v. Allah,* 71 N.Y.2d 830, 527 N.Y.S.2d 731, 522 N.E.2d 1029, 1030 (1988) ("Even if his assistance was not initially planned, the totality of the evidence permits only the conclusion that he knowingly participated and continued to

---

**8.** Petitioner stated that he also simultaneously grabbed the stabber's hand in order to stop

him from taking the money. (Tape at 8:53:00–15.)

participate even after his companion's intentions became clear."); *In re Juan J.*, 180 A.D.2d 495, 580 N.Y.S.2d 243, 245 (1st Dep't 1992) (finding that "the fact that [defendant] and the other continued to hold [the victim] down as his wallet was stolen" supported the inference of shared intent to rob). If credited, this testimony suggests that petitioner intentionally aided the stabber's seizure of the money and did not view it as a hostile or competitive act.

The testimony on this point, however, had several weaknesses. First, the inference of shared intent depends on the precise chronology and configuration of the scuffle, and yet confidence in the witnesses' testimony to these details relies on their accurate perception and recollection of a brief, chaotic tug-of-war in the middle of the night. Second, actual conflicts among witnesses' accounts of this episode provide some reason to question their precision. Randolph and Hunter, for instance, disagreed about whether Fedorischak was simply holding the money in his left hand, (10/9/90 Trial Trans. at 87 (Randolph)), or in his right, while in his left hand he held the vial of crack, (*id.* at 177 (Hunter)).[9]

More serious still were conflicts specific to the grabbing episode itself. Not only did petitioner's contemporaneous, uncounseled statement conflict with Hunter's and Randolph's account,[10] but Hunter's own statement signed immediately after the incident stated that the same who person grabbed Fedorischak's wrist also pried out the money. (10/9/90 Trial Trans. at 221 (Hunter); 10/11/90 Trial Trans. at 367 (Detective Crowley).) Because "the evolution over time of a given eyewitness's description can be fatal to its reliability," the "jury could reasonably have been troubled by the adjustments to [Hunter's] original story by the time of the second trial." *Kyles*, 514 U.S. at 443–44, 115 S.Ct. 1555.

The competing explanations for the change in Hunter's account raise further questions about his credibility. At trial, Hunter denied having told police that a single person grabbed both Fedorischak's wrist and the money, and he also denied having read the statement before signing it. (10/9/90 Trial Trans. at 222 (Hunter).) At the first trial, however, he acknowledged having read the statement and instead explained the discrepancy by testifying that "at that point I wasn't too sure, I couldn't pinpoint who grabbed and took what at that time." (10/10/90 Trial Trans. at 239, 245 (Hunter).) Hunter's own accounts suggest at best an uncertain memory of critical events. Defense counsel made the plausible suggestion that shifts in Hunter's recollections were motivated by the cooperation agreement pursuant to which the State recommended Hunter's release from prison. (10/9/90 Trial Trans. at 144–45, 209 (Hunter); 10/10/90 Trial Trans. at 259 (Hunter).) At the time of the agreement, Hunter had been incarcerated and unable to meet $2,500 bail on charges brought against him in the months immediately following the murder, (10/9/90 Trial Trans. at 144–45, 209 (Hunter); 10/10/90 Trial Trans. at 259 (Hunter)); the jury could reasonably have inferred that Hunter's perceived incentives to provide testimony that would curry favor with prosecutors overcame his promise in the cooperation agreement to testify truthfully. *See United States v. Arroyo–Angulo*,

---

9. Randolph did not see petitioner give Fedorischak any package at all. (*Id.* at 125.) In this respect, Hunter's and petitioner's testimony were in closer agreement, petitioner having stated that the incident began with his giving Fedorischak a package of Ultra, a form of imitation crack cocaine. (Tape at 8:47:00–30.)

10. Petitioner claimed that when the stabber attempted to grab Fedorischak's money, petitioner grabbed both Fedorischak's and the stabber's wrists, and that Hunter then snatched the money and fled the scene prior to the stabbing. (Tape at 8:52:40–53:15.) Hunter, Randolph, and Officer Sheehan all testified to the contrary that Hunter remained at the scene throughout the incident and chased the truck after the stabbing. (10/9/90 Trial Trans. at 43–44 (Sheehan), 94 (Randolph), 187–88 (Hunter).)

580 F.2d 1137, ·1146 (2d Cir.1978) (noting that cooperation agreements "create[ ] a double-edged sword and it is debatable which edge cut[s] more deeply").

Hunter's credibility was also undermined by his long criminal record. His convictions for separate instances of assaulting a police officer, resisting arrest, purse-snatching, and larceny suggest both personal dishonesty and a willingness to place his own interests above the public's. *See People v. Hunter*, 180 A.D.2d 752, 580 N.Y.S.2d 387, 388 (2d Dep't 1992).

These credibility concerns notwithstanding, Hunter's account of the sequence of events in which petitioner grabbed Fedorischak's hand and the stabber stole the money was largely corroborated by Randolph, about whose credibility no substantial questions were raised at trial.

### (2) The Other Evidence of Shared Intent to Rob

The remaining evidence of intent was both less firmly established at trial and less probative of the mental state in question.

Hunter testified that after the stabber took the money, petitioner told Hunter to "stay out of it," (10/9/90 Trial Trans. at 182), and that when the stabber told petitioner to move, he did so, thereby opening up the space through which the stabber plunged a knife into Fedorischak, (*id.* at 183–84). This evidence is consistent with both (1) the theory that petitioner was enabling the attack and preventing interference with the robbery, and (2) the theory that petitioner was attempting to avoid escalation of an already tense situation and/or avoid harm to himself. *Cf. People v. Yarrell*, 146 A.D.2d 819, 537 N.Y.S.2d 294, 296 (2d Dep't 1989) (Brown, J., dissenting) (evidence that defendant "ducked" when police shouted "don't move" was insufficient to support accomplice liability on the theory that it showed awareness that his co-defendant had a gun and was about to initiate a shootout), *rev'd*, 75 N.Y.2d 828, 552 N.Y.S.2d 557, 551 N.E.2d 1235 (1990) (adopting Justice Brown's dissenting opinion). Consequently, it provides at most weak proof that petitioner intended to assist the stabber's robbery.

Hunter also testified that after the stabbing, petitioner shouted at Randolph "Get the fuck out of here before we fuck you up, too." (10/9/90 Trial Trans. at 186.) Respondent argues that use of the first-person plural implies that petitioner had been acting in concert with regard to the robbery and murder; this interpretation is plausible, although the speaker might simply have been trying to scare off Randolph with whatever came to mind. More troubling is that Randolph testified on direct examination that he could not identify the person who yelled "[t]hat I'd better get out of here or I'd be next," (*id.* at 92), and in the first trial he testified that the speaker was the man with the lazy eye, not petitioner, (*id.* at 119).

Given the equivocal significance of these details and their basis only in testimony from Hunter, whose credibility was subject to serious doubt for several reasons, they provided weak evidence of petitioner's shared intent with the stabber.

### c. The Knife Evidence's Likely Impact on the Verdicts

The critical question is whether the knife evidence removed a reasonable doubt that otherwise would have remained with the jury.

Although the knife evidence was neither overwhelming in its volume nor provocative in its details, the prosecution's summation and the lack of any limiting instructions heightened the potential for material prejudice. The State's closing arguments both focused the jury's attention on the knife evidence and specifically recommended that the jury draw improper propensity inferences. The State argued that the knife evidence showed that petitioner acted in concert with the stabber in two ways: first, it showed that petitioner "was ready to use additional force himself," *i.e.* that he shared the requisite mental culpa-

bility of intent to use force to effectuate the robbery; second, "that he knew force was a real possibility of what might happen," *i.e.* that he went into the putative drug transaction anticipating (presumably with the stabber) that it might escalate into a robbery. (10/11/90 Trial Trans. at 415.) When, as here, the critical issue is something as elusive as a defendant's state of mind, appeals to character evidence are especially dangerous. As then-Chief Judge Cardozo put it:

> Delicate enough and subtle is the inquiry, even in the most favorable conditions, with every warping influence excluded. There must be no blurring of the issues by evidence illegally admitted and carrying with it in its admission an appeal to prejudice and passion.

*Zackowitz,* 172 N.E. at 467.

Assessing the likelihood that this prejudicial appeal affected the verdict is difficult. Not only must the Court rely on a cold record, but reasonable jurors may differ in their conclusions concerning the weight of the evidence and the credibility of testimony, as well as in their susceptibility to prejudicial appeals. The first trial's end in a hung jury, however, does suggest that the knife evidence intruded on a fairly close case.[11] *See Kyles,* 514 U.S. at 455, 115 S.Ct. 1555 (Stevens, J., concurring) (noting that a hung jury in the first trial suggested that errors at the second trial were material to its outcome); *United States v. Faison,* 679 F.2d 292, 297 (3d Cir.1982) ("The fact that the first trial yielded a hung jury suggests that the evidence against defendant had weaknesses.").

Furthermore, no limiting instruction warned the jury away from unfair and prejudicial uses of the knife evidence. Ordinarily, when probative evidence is admitted for one purpose but runs the risk that the jury will improperly draw additional inferences of criminal propensity, the judge should give a limiting instruction. *See Dunnigan,* 137 F.3d at 127. Such instructions substantially mitigate the danger that evidence capable of improper use will undermine the fundamental fairness of the trial. *See Spencer,* 385 U.S. at 562–63, 87 S.Ct. 648; *see also Dowling,* 493 U.S. at 353, 110 S.Ct. 668 (noting significance of limiting instructions). Here, however, the trial judge believed that the evidence was properly admitted to show criminal intent and accordingly gave no limiting instruction.[12] Consequently, the jury instructions provided no protection against improper propensity inferences.

### d. Conclusion

Taking all these considerations into account and giving due deference to the Appellate Division's decision, admission of the knife evidence was not so serious an error that the only reasonable conclusion is that it deprived petitioner of a fundamentally fair trial. This is not a case in which character evidence provided the only substantial basis for inferring criminal intent or the only basis for deciding between two equally likely perpetrators, *cf. McKinney,* 993 F.2d at 1385, nor is it one in which highly inflammatory material likely poisoned the jury's deliberations with malevolence or revulsion towards petitioner or overcame the presumption of innocence. Instead, the State offered a number of specific grounds from which to infer petitioner's criminal intent and merely bolstered them with its improper references

---

11. Petitioner's brief on direct appeal represents that, in a portion of the proceedings not included in the record here, Justice Lowe stated that the jury in the first trial was evenly divided as to the proper verdict. (Petit. Brief at 4.)

12. Presumably for the same reason, defense counsel did not specifically request a limiting instruction after his prior objections to admit-

ting the knife evidence were overruled. Accordingly, the Court does not view this silence as a waiver. *See Anderson v. Branen,* 17 F.3d 552, 556–57 (2d Cir.1994) (finding no waiver of objection to instructions "where the party's position has previously been made clear to the trial court and it was apparent that further efforts to object would be unavailing").

to, and argument about, petitioner's knife possession. In these circumstances, it is not unreasonable to conclude that petitioner received "a trial worthy of confidence," *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490, in which there was no reasonable probability that exclusion of the knife evidence would have altered the verdict.

### III. *Conclusion*

For the reasons stated above, the Court denies the petition. Because petitioner has made a substantial, though insufficient, showing of a denial of a constitutional right, a certificate of appealability will issue solely with regard to his claim concerning the knife evidence. *See* 28 U.S.C. § 2253(c)(3); *Lozada v. United States,* 107 F.3d 1011, 1013 (2d Cir.1997); *Reyes v. Keane,* 90 F.3d 676, 680 (2d Cir.1996). The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would be taken in good faith. *See Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

The Court denies petitioner's application for appointment of counsel because he has not shown financial inability to obtain representation, *see* 18 U.S.C. § 3006A(a)(2), despite a March 3, 2000 request from the Court's law clerk that petitioner document his financial eligibility. The Court expresses no opinion as to whether petitioner may reapply for appointment of counsel to assist in any appeal. The Clerk of Court is directed to close this case. Any pending motions are moot.

SO ORDERED.